1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT
8           WESTERN DISTRICT OF WASHINGTON AT SEATTLE

NORTHSHORE SHEET METAL, INC.,        Case No.
9
                          Plaintiff,   ***PLAINTIFF'S EX PARTE* MOTION FOR
10                                       A *TEMPORARY RESTRAINING ORDER***

11     v.

12   SHEET METAL WORKERS                 **Note on Motion Calendar:**
     INTERNATIONAL ASSOCIATION,          **Monday, August 24, 2015**
13   LOCAL 66,

14                          Defendant.

15        Plaintiff Northshore Sheet Metal, Inc. ("Plaintiff" or "Northshore"), by and thorough
16
   its counsel, hereby moves this Court for a temporary restraining order ("TRO").  The TRO
17
   would restrain Defendant Sheet Metal Workers International Association, Local 66
18
   ("Defendant" or "Union") from engaging in its strike action against Northshore and its
19
   customers based upon a breach of the Parties' labor agreement (i.e. no-strike provision).
20
   This action is brought, pursuant to Section 301 of the Labor Management Relations Act
21
   ("LMRA").  This motion is made, pursuant to Fed. R. Civ. P. 65.
22
23
24
25

*Ex Parte* **Motion for TRO - Page 1**            **DAVIS GRIMM PAYNE & MARRA**
CASE NO. _____                             701 Fifth Avenue, Suite 4040
                                                  Seattle, WA 98104
                                                  Ph. (206) 447-0182 • Fax: (206) 622-9927

# I.  NATURE OF PROCEEDINGS

Northshore seeks a TRO to enjoin the Union's strike action.  The Union is engaged in a strike concerning monies allegedly owed based upon the Parties' January 2015 Settlement Agreement ("Settlement Agreement").  This Settlement Agreement contains a dispute resolution clause.  As part of this dispute resolution clause, the Parties have incorporated by reference the mandatory, final and binding arbitration procedures in the Parties' collective bargaining agreement.  No-strike clauses are the *quid pro quo* under federal labor law for final and binding arbitration.  The federal courts will find a no-strike clause, even without express language, when the Parties agree to final and binding arbitration over a dispute.  *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368 (1973).  Injunctive relief is appropriate when a union strikes over a dispute that is subject to final and binding arbitration.  *Boys Market, Inc. v. Retail Clerk's Union Local 770,* 398 U.S. 235 (1970).

Here, the Union has engaged in a strike based upon a dispute over Section 3.5 of the Parties' Settlement Agreement.  Because the Settlement Agreement contains a final and binding arbitration provision, the Union has breached its contractual obligation not to strike. Moreover, the dispute in question also arises from the Parties' collective bargaining agreement, which also contains a compulsory binding arbitration provision.  Northshore seeks injunctive relief to end the strike and require the Union to arbitrate the dispute.  *Id.* (This type of injunction is commonly referred to as a "*Boys Market* Injunction.")

Immediate injunctive relief will prevent the Union from causing immediate and irreparable harm to Northshore.  A TRO will properly prevent the Union from continuing to

*Ex Parte* **Motion for TRO - Page 2**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

1    breach its contractual obligation not to engage in strike activity.    Every day that passes

2    causes irreparable harm to Northshore if a TRO is not entered.

## II.  PROCEDURAL NOTICE UNDER FRAP 65

4        On August 10, 2015, Plaintiff was informed that union membership had authorized

5    the strike vote.  **(Meyer Decl., ¶ 8)**  On August 20, 2015, the Union engaged in a strike

6    action aimed at Northshore and specified construction sites where Northshore has performed

7    work.  **(*Id., ¶ 9*)**

8        On that same day, August 20, the Strikers had pickets announcing they were striking

9    over "benefits".  **(Meyer Decl., Exh. 1)**  The benefits in question are related to a dispute

10   over payments regulated by the Parties' Settlement Agreement[1].  **(Meyer Decl., ¶ 10; Exh.**

11   **2 (Section 3.5).)**  The Settlement Agreement contains a dispute resolution clause in Section

12   8.5, which incorporates by reference the Parties' mutually agreed-upon arbitration

13   procedures found in the Letter of Understanding.  **(Meyer Decl., Exh. 4.)**  The LOU is part

14   of the Parties' collective bargaining agreement.  **(*Id.*)**

15

16       Also, on August 20, Northshore informed the Union that the strike breached the

17   Parties' contractual obligation to arbitrate disputes.  **(Hilgenfeld Decl., Exh. 9.)**  Northshore

18   further demanded that the Union immediately stop all strike activity.  **(*Id.*)**

19       The strike action has not ceased.  The Union has also expressly stated that it has no

20   intention of doing so.  **(Hilgenfeld Decl., Exh. 11.)**

21       On August 21, 2015, Northshore, by and through its attorney, contacted the Union's

22   attorney.  **(Hilgenfeld Decl., ¶ 10)**  Northshore informed the Union of its intention to file for

23   ———————————————

[1] Prior to August 2015, the Parties had reached a tentative agreed to wages and benefits for the successor
24   agreement.  **(Meyer Decl., ¶ 6.)**  As a result, the Union cannot claim that they are picketing over future
benefits, because the Parties reached a tentative agreement on the future benefits for the bargaining unit
25   members.

*Ex Parte* **Motion for TRO - Page 3**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

a *Boys Market* injunction, and a temporary restraining order.  **(Id.)**  Northshore offered to withhold filing the TRO, if the Union would agree to cease its strike action until the Court could hear the preliminary injunction.  **(Id.)**  The Union refused to cease its strike action. **(Hilgenfeld Decl., Exh. 12.)**

Northshore has satisfied the notice requirements of Fed. R. Civ. P. 65(a).  To the extent that additional notice is required, the requirements of Fed. R. Civ. P. 65(b) has also been met.

## III.  FACTS

### A.  THE STRIKE'S PURPOSE.

The Union has informed the public through picket signs that it has engaged in a strike against Northshore over "benefits" owed.  **(Meyer Decl. Exh. 1)**  The issue regarding "benefits" is related to a dispute over the terms of a Settlement Agreement.  **(Meyer Decl., ¶ 10)**  The Parties had agreed that any disputes involving the Settlement Agreement would be resolved through its dispute resolution clause.  **(Id., Exh. 2.)**

The Union has made it clear that a purpose of the strike involves payments allegedly owed, pursuant to the Settlement Agreement.  The sequence of events surrounding the strike proceeds as follows.

On August 7, 2015, the Parties met to bargain over the successor collective bargaining agreement.  The Union claimed that one of the outstanding issues remaining between the Parties were the "fringe benefits" allegedly owed, pursuant to Section 3.5 of the Settlement Agreement[2].  **(Meyer Decl., ¶ 7.)**

---

[2] There are no fringe benefits owed.  The Union has alleged, however, that monies owed to the Supplemental Plan Trust on behalf of the employees, pursuant to Section 3.5 of the Settlement Agreement, have not been properly paid.

*Ex Parte* **Motion for TRO - Page 4**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

On August 10, 2015, the Union members authorized a strike.  **(Meyer Decl., ¶ 8.)**

On August 13, 2015, the Union mailed a letter claiming that the issue of "fringe benefits" and bargaining were not separated and the Union would continue to raise that issue[3].  **(Hilgenfeld Decl., Exh. 13.)**

On August 20, 2015, the Union engaged in a strike against Northshore.  **(Meyer Decl.)**  The Strikers picketed the Northshore facility, as well as construction sites where Northshore has contracted to perform work.  **(*Id.*)**  The Union's picket signs stated: **"NORTHSHORE PAY MY BENEFITS! LABOR DISPUTE" (Meyer Decl., Exh. 1.)**

The only conceivable issue with benefits relates to the Union's claim that the employees were not properly paid, pursuant to Section 3.5 of the Settlement Agreement. **(Meyer Decl., ¶ 6, 10; Exhs. 1., 2; Hilgenfeld Decl., Exhs. 4, 11, 12.)**  After all, the Parties have reached a tentative agreement on the wages and benefits for the successor agreement. **(*Id.*)**  This was also confirmed later by additional Union correspondence.  **(Hilgenfeld Decl., Exhs. 11, 12.)**

On August 20, 2015, Northshore informed the Union of its contractual obligation to not strike based upon the Settlement Agreement.  **(Hilgenfeld Decl., Exh. 10.)**  On August 21, 2015, the Union tacitly acknowledged that the dispute over the Settlement Agreement was a reason for its strike[4].  **(Hilgenfeld Decl., Exh. 8.)**

As a result, the Union's strike action concerns, at least in part, a dispute over Section 3.5 of the Parties' Settlement Agreement.

---

[3] Northshore has never claimed that the Union could not bring up this issue in bargaining.  Northshore has merely pointed out that the Union continues to mix the issues when they are separate and distinct.

[4] The Union also claimed, for the first time after being informed of this Motion, that there were a "number of other" reasons to strike.  **(Hilgenfeld Decl., Exh. 12.)**  The only other reason ever indicated by the Union to Northshore's knowledge is detailed in footnote 7 in this Brief, and involves striking over a permissive subject of bargaining, which is not permitted under the law.

*Ex Parte* Motion for TRO - Page 5
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

**B.**   **THE SETTLEMENT AGREEMENT'S ARBITRATION PROVISIONS.**

The January 2015 Settlement Agreement has a dispute resolution clause. **(Meyer Decl., Exh. 2 (Section 8.5).)** This dispute resolution clause incorporates by reference the final and binding arbitration procedures found in the Parties' collective bargaining agreement. **(Meyer Decl., Exh. 3.)** As will be discussed more fully below, labor agreements with a final binding arbitration clause create an implied contractual obligation not to strike. *Gateway Coal,* 414 U.S. at 374.

**C.**   **BACKGROUND FACTS REGARDING THE SETTLEMENT AGREEMENT.**

On January 12, 2015, the Parties executed the Settlement Agreement. This Settlement Agreement was the culmination of a lengthy and disruptive labor dispute. **(Meyer Decl., 2)** As part of that dispute, there were three federal lawsuits, a number of NLRB charges, determinations before the Washington Department of Labor & Industries, bargaining for a successor labor agreement, and an illegal strike. *(For a historical review of this labor dispute see 14-cv-00279, Dkt. 9.)*

As described in *14-cv-00279, Dkt. 9,* the Parties had actually reached an earlier settlement agreement. **(Id.; see also Meyer Decl., Exh. 2.)** That occurred on April 25, 2013. **(Id.)** That settlement agreement was also intended to resolve all disputes. **(Id.)** That agreement was signed by Northshore and the Union, however, it did not contain a dispute resolution clause[5]. **(Id.)** There was ultimately a dispute over the terms of the April 25, 2013 settlement agreement, which exacerbated the labor issues. **(Id.)**

---

[5] The Parties had also not signed a successor agreement at that time.

*Ex Parte* **Motion for TRO - Page 6**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

Prior to entering into the January 2015 Settlement Agreement, an audit was performed to ensure that everyone understood what had been paid, what had not been paid, and what would be considered due and owing. *(Id.)* From that audit, the Parties fashioned monetary contributions. The Parties understood and agreed upon exact contributions owed to different Trust entities and Northshore; and, the Parties also agreed that Northshore, the Union, the local Trusts and their beneficiaries would waive and release any amounts that were not incorporated into the Settlement Agreement. *(Id.; Exh. 2 (Article 5).)* The Parties also left a window open for the local Trusts to come back and seek additional monies – 90 days (Section 3.3); and, an additional window for the employees (but not the Trusts or Trust beneficiaries) at 180 days. **(Meyer Decl., Exh. 2 (Sections 3.3, 3.5).)**

### D. THE TERMS OF THE JANUARY 2015 SETTLEMENT AGREEMENT.

Due to the Parties' antagonistic relationship, the January 2015 Settlement Agreement was fashioned to ensure the Parties would be required to proceed through dispute resolution if there were any additional disputes over its terms. The Parties understood that there could be disputes over the terms, especially Sections 3.3 and 3.5. As a result, the Parties expressly agreed that a dispute over Sections 3.3 and 3.5 was subject to the Settlement Agreement's dispute resolution clause, even though entire agreement was also subject to the dispute resolution clause. *(Id.)*

The dispute resolution clause is found in Section 8.5 of the Settlement Agreement. *(Id.)* That clause provides for mandatory mediation should a dispute arise over the "meaning, interpretation, or enforcement" of the Settlement Agreement. If the matter is not

*Ex Parte* **Motion for TRO - Page 7**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

resolved at mediation, the Parties expressly agreed to be bound by the mandatory arbitration procedures that were governing the Parties' collective bargaining agreement[6]. *(Id.)*

These procedures were intended to fully ensure that the Parties would suffer from no more labor strife related to the issues in the Settlement Agreement.

**E.   THE CURRENT LABOR DISPUTE INVOLVING SECTION 3.5 THAT IS ONE OF THE REASONS FOR THE UNION'S STRIKE ACTIVITY.**

On July 9, 2015, the Union sent a list of employee names, and demanded payment, pursuant to Section 3.5 of the Settlement Agreement. **(Hilgenfeld Decl., Exh. 4.)** The Union provided no monetary amount that was owed. Nor did the Union provide any justification – other than mentioning Section 3.5 of the Settlement Agreement – as to why the employees were owed money.

Section 3.5's 180-day period to claim additional monies expired on Saturday, July 11, 2015.

On July 13, 2015, Northshore sought all relevant information related to the Union's claim that the employees were not paid properly, pursuant to the terms of the Settlement Agreement[7]. **(Hilgenfeld Decl., Exh. 5.)** Northshore needed the information to determine if any individuals were potentially owed money; and, if so, how much. **(Hilgenfeld Decl., Exh. 5.)**

On July 20, 2015, the Union partially responded. **(Hilgenfeld Decl., Exh. 6.)** The attachment to the email included a self-created spreadsheet for the individual employees,

---

[6] The Parties did not incorporate the expiration date, or any other limitation from the collective bargaining agreement into the Settlement Agreement.

[7] This information request is governed by 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d).

*Ex Parte* **Motion for TRO - Page 8**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

and dates that they should have received Trust contributions for the Supplemental Plan[8]. *(Id.)*    The Union provided no documentary support for the spreadsheet. The Union also provided no information as to who how the spreadsheet was created, by whom, using what information. The Union also provided no information as to why the Supplemental Plan was listed as the primary entity that had not received payments when payments to the Supplemental Plan Trust Fund were resolved, pursuant to Section 3.3 of the Settlement Agreement. *(Id.)* The Union's partial response provided more questions than answers.

On July 28, 2015, because the Union's response created more confusion, Northshore sought clarification. **(Hilgenfeld Decl., Exh. 7.)** The Union has still not answered this request, nor has the Union given any indication that it intends to do so.

On August 7, 2015, the Parties met to bargain over the successor collective bargaining agreement. During the bargaining session, as indicated above, the Union claimed that there was still a problem with the "fringe benefits" owed under the Settlement Agreement[9].   **(Meyer Decl.)** This is when the Union began discussing its dispute over "fringe benefits" as connected to the strike. *See III.A. above.*

///// ///// /////

///// ///// /////

///// //// /////

---

[8] The Supplemental Plan's complete name is the Northwest Sheet Metal Workers Supplemental (401k) Pension Trust. This Trust was a signatory to the Settlement Agreement.

[9] The Union initially intimated that it would strike, if necessary, over whether the Parties' collective bargaining agreement would extend to work outside of Local 66's jurisdiction – which is essentially Western Washington – when the work was performed by non-Local 66 members. Work outside of a union's jurisdictional area is considered a permissive item of bargaining. *A.D. Cheatham,* 126 NLRB 997, 1002-03 (1960). Strikes over permissive subjects of bargaining are considered unprotected by the NLRA, and subject the Union to unfair labor practice charges. *Id.* After being informed that the Union's position concerned a permissive item of bargaining, and the Union was not permitted to strike over a permissive item of bargaining, then the Union started bringing up the "benefits" issue connected to bargaining and potentially a strike.

*Ex Parte* Motion for TRO - Page 9
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

## IV.  ANALYSIS

### A.  NORTHSHORE HAS MET THE RULE 65 STANDARD FOR A TEMPORARY RESTRAINING ORDER.

Northshore has provided notice, pursuant to Fed. R. Civ. P. 65(a).  *See Section II above.*  However, to the extent more notice was required, Northshore meets the standard enunciated in Fed. R. Civ. P. 65(b).

Under Fed. R. Civ. P. 65(b), a Court may issue an TRO only if: (1) "Specific facts in an affidavit clearing show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition"; and (2) the movant's attorney certifies in writing that efforts were made to give notice and the reasons why it should not be required.  *Ex Parte* orders "should be restricted."  The Court may grant the TRO, without written or oral notice, so long as the movant's attorney certifies in writing "any efforts made to give notice and the reasons why [notice] should not be required."  Fed. R. Civ. P. 65(b)(1)(B).

Here, Northshore's attorney provided both oral and written notice to the Union's attorney.  (**Hilgenfeld Decl., Exh. 10.**)  Northshore offered to refrain from filing the TRO, if the Union would cease its strike action until the matter could be heard by the Court.  (**Id.**)  The Union's attorney responded, stating the Union intended to continue its strike.  (**Hilgenfeld Decl., Exh. 12.**)  Northshore attempted to resolve this matter.  Only once it was determined that resolution was not possible prior to the Court hearing Northshore's preliminary request, did Northshore seek this TRO.

To grant a preliminary injunction, Northshore must show: (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious

*Ex Parte* Motion for TRO - Page 10
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

questions are raised and the balance of hardships tips sharply in favor of the moving party. *Dr. Seuss Enters. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1397 n. 1 (9th Cir. 1997). The requirements for a temporary restraining order are substantially the same. *Protectmarriage.com v. Courage Campaign,* 680 F. Supp. 2d 1225, 1228 (E.D. Cal. 2010) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 839 (9th Cir.2001); Wright and Miller, 11A Fed. Prac. & Proc. Civ. § 2951 (2nd ed.)). These standards "are not separate tests but the outer reaches of a single continuum." *International Jensen, Inc. v. Metrosound U.S.A.,* 4 F.3d 819, 822 (9th Cir.1993) (citation omitted).

> [A] moving party need not demonstrate that he risks irreparable injury, but he must at least show that he will suffer a degree of hardship that outweighs the hardship facing the opposing party if the injunction is not issued. Similarly, a moving party need not demonstrate that he will succeed on the merits, but must at least show that his cause presents serious questions of law worthy of litigation.

*See Topanga Press, Inc. v. City of Los Angeles,* 989 F.2d 1524, 1528 (9th Cir.1993). These two factors represent two points on a sliding scale. *Diamontiney v. Borg,* 918 F.2d 793, 795 (9th Cir.1990) (quoting *Oakland Tribune, Inc. v. Chronicle Publishing Co.,* 762 F.2d 1374, 1376 (9th Cir.1985)). (The standards for a preliminary injunction are discussed in *Section IV.B.4. of this Brief.*)

### B.   *BOYS MARKET* PERMITS THIS INJUNCTION.

The Court should enter a TRO until the matter can be fully heard and briefed to the Court.   The Court's inherent powers allow it to restrain the Union's strike action. Northshore anticipates that the Union will claim that the Court is prohibited from entering a TRO in this matter based upon the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*

*Ex Parte* Motion for TRO - Page 11
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

*Boys Market* is an exception for labor disputes under the Norris-LaGuardia Act.  *Id.* Congress passed the Taft-Hartley Act in 1947 (also referred to as the Labor-Management Relations Act).   Section 301 of the LMRA confers jurisdiction on the federal courts for contractual violations between an employer and the employees' bargaining representative. 29 U.S.C. § 185.  Fifteen years prior, in 1932, Congress passed the Norris-LaGuardia Act. The Norris-LaGuardia Act denies federal courts jurisdiction to issue injunctive relief in certain enumerated concerted activities involving "labor disputes."  29 U.S.C. § 104.  The U.S. Supreme Court has found that Section 301 of the LMRA does permit the federal courts to enjoin striking activity in certain situations, such as a strike in violation of a contract's compulsory arbitration procedures.  *Boys Market v. Retail Clerks Union*, 398 U.S. 235, 253 (1970).

Under the *Boys Market* exception, a labor strike may be enjoined when it arises out of a labor dispute that "is the subject of compulsory arbitration, provided the usual equitable requirements are met."  *Elevator Manufacturers Assoc. v. Local 1, Int'l Union of Elevator Constructors,* 689 F.2d 382, 385 (2nd 1982).

In *Boys Market, Inc.*, the U.S. Supreme Court set forth the specific circumstances in which a district court may enjoin a labor strike.  398 U.S. at 249-53.  Those circumstances include: (1) the labor agreement is governed by § 301 of the LMRA; (2) the labor agreement contains a no-strike clause; (3) the underlying dispute or disputes involved are subject to the mandatory arbitration procedures; and, (4) the traditional requirements of equity – irreparable harm and balance of hardships – are satisfied.  *See generally Id.*

///// ///// /////

*Ex Parte* **Motion for TRO - Page 12**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

1.   **The Parties' Labor Agreements are Governed by § 301 of the LMRA.**

There are two potential labor agreements that are governed by Section 301 of the LMRA that are potentially applicable: (a) January 2015 Settlement Agreement; and (b) the Parties' June 1, 2009 – May 31, 2012 collective bargaining agreement.  Both agreements require mandatory arbitration for the dispute in question.  The Parties expressly intended the Settlement Agreement to apply the dispute resolution procedures found in that agreement for any dispute related to Section 3.5; however, to the extent the Court would find that the Settlement Agreement is not applicable to this *Boys Market* injunction request, then the Parties' collective bargaining agreement would also apply, and it would also require mandatory arbitration for this dispute.

   a.   *Northshore and Local 66's January 2015 Settlement Agreement is a Labor Agreement under § 301 of the Labor-Management Relations Act.*

The Settlement Agreement is considered a contract governed by Section 301 of the LMRA.  Section 301 governs contracts between a labor organization and an employer that "are significant to the maintenance of labor peace between them." *Retail Clerks Int'l Assoc., Local 128 v. Lion Dry Goods*, 369 U.S. 17, 28 (1962).  The January 2015 Settlement Agreement is a contract between an Employer and a Union.  **(Meyer Decl., Exh. 2.)**  That Agreement was also significant to resolve labor peace between them.  As such, the Settlement Agreement is enforceable and governed by Section 301 of the LMRA.  29 U.S.C. § 185.

Section 301 of the LMRA gives federal courts power to fashion a body of federal law to adjudicate and enforce contracts between unions and employers.  *Textile Workers*

*Ex Parte* **Motion for TRO - Page 13**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

*Union of America v. Lincoln Mills of Alabama*, 353 U.S. 448 (1957); *See Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 210-11 (1985). **Section 301 of the LMRA does not differentiate between what types of agreements are governed by federal common labor law between an employer and a union**. *See Retail Clerks Intern. Assoc. Local Unions Nos. 128 and 633 v. Lion Dry Goods Inc.*, 369 U.S. 17, 21, 82 S.Ct. 541 (1962) (Supreme Court found a strike Settlement Agreement to be a "contract" for the purposes of Section 301 of the LMRA); *see generally*, *Stallcop v. Kaiser Found. Hosp.*, 820 F.2d 1044, 1048 (9th Cir. 1987) (finding an oral agreement made in connection with reinstatement to be part of a CBA). If the Agreement meets the definition under Section 301 of the LMRA, then it is governed by the federal common law created by Section 301. As a result, the *Boys Market* injunction would be available. Here, the January 2015 Settlement Agreement is a labor agreement governed by Section 301 of the LMRA.

> **b.** ***In addition, this dispute also triggers the Parties' collective bargaining agreement's mandatory arbitration procedures.***

A dispute involving a settlement agreement can still implicate the Parties' collective bargaining agreement's mandatory arbitration mechanism. "A collective bargaining agreement is not limited solely to the specific provisions in the basic labor contract formally executed by the parties…." *Inlandboatmens Union of the Pacific v. Dutra Group,* 279 F.3d 1075, 1079 (9th Cir. 2002) *overruled on other grounds by Albino v. Baca,* 747 F.3d 1162, 1171 (9th Cir. 2014)). A collective bargaining agreement includes additional written side agreements, settlement agreement, and even oral understandings. *Id.*

> 'It has long been settled that the explicit terms of a collective bargaining agreement do not necessarily establish its boundaries.' Rather, any such separate agreement that speaks to an issue that is within the scope of the collective bargaining agreement, broadly

*Ex Parte* **Motion for TRO - Page 14**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

interpreted, is 'part and parcel of the collective bargaining agreement and subject to its terms, including the grievance procedure.'

*Slye v. Central States Southeast and Southwest Areas Health and Welfare Fund,* 956 F. Supp 1357, 1364-65 (1997) (*quoting Eitman v. New Orleans Public Serv., Inc.,* 730 F.2d 359, 363 (5th Cir. 1984)).

In *Dutra Group*, the parties settled a dispute prior to proceeding to arbitration. The employer allegedly failed to adhere to the terms of the settlement agreement. 747 F.3d at 1077. The settlement agreement did not contain its own arbitration procedures. *Id.,* at 1077-78. The union brought a § 301 action to enforce the arbitral award. *Id.* The employer then moved to dismiss and require arbitration based upon the parties' collective bargaining agreement ("CBA"). *Id.* The Ninth Circuit affirmed the dismissal of the union's case, based upon the arbitration procedures in the parties' collective bargaining agreement. In so finding, the Court held: if the side (or settlement) agreement's dispute relates to a subject that is "within the scope of the CBA's arbitration clause," the matter is subject to arbitration, pursuant to the CBA. *Id.*, at 1079.

In the instant matter, the Settlement Agreement was based upon a number of issues; but, the primary issue involved the terms of the 'successor agreement' and the amount of wages and fringe benefits owed during its term up to that point. **(Meyer Decl., Exh. 2.)** The Parties were attempting to ensure that the wages and benefits found in the collective bargaining agreement were properly allocated, and that any amount not allocated was waived and released to ensure stability and labor peace moving forward. **(*Id.*)** The dispute over the terms of Section 3.5 is certainly within the scope of the collective bargaining agreement.

*Ex Parte* **Motion for TRO - Page 15**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

Even with the express dispute resolution provisions in the Settlement Agreement, the collective bargaining agreement's arbitration provisions also apply[10]. The Union responded to Northshore's notice to seek a TRO by citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190 (1991), and claiming arbitration is not appropriate. **(Hilgenfeld Decl., Exh. 12)**. The Union's reliance in *Litton Financial* is misplaced. In *Litton Financial*, the U.S. Supreme Court recognized that the duty to arbitrate is a contractual one. 501 U.S. at 204. The matter of arbitration must be determined by the contract. *Id.* As a result, after the collective bargaining agreement expires, the obligation to be bound by that arbitration clause similarly expires[11]. However, and this is the key point, whether a contractual duty has arisen to arbitrate a dispute is judged on whether the dispute has arisen from the collective bargaining agreement, or in the post-contract period (i.e. expiration period). "It follows that if a dispute arises under a contract here in question, it is subject to arbitration even in the post-contract period." *Id.*, at 205; *see also Nolde Bros. v. Local 358, Bakery & Confectionary Workers Union*, 430 U.S. 243, 255 (1976)). The proper question is: did the dispute arise under the terms of the collective bargaining agreement, or after?

> were in the nature of 'accrued' or 'vested' rights, earned by employees during the term of the contract on essentially the same basis as vacation pay, but payable only upon termination of employment.
>
> ***

---

[10] As it relates to this dispute, the only difference between the two is that the Settlement Agreement required compulsory mediation prior to arbitration; however, the end result in both agreements is mandatory arbitration.

[11] *Litton, supra,* is entirely misplaced related to the Settlement Agreement's dispute resolution provisions. The Settlement Agreement has not expired. The Parties adopted the mandatory arbitration mechanism found in the LOU; the Parties did not include or adopt the expiration date of the collective bargaining agreement (May 31, 2015) to the Settlement Agreement. In fact, the terms in Section 3.5, permitting the employees 180 days, shows the Parties did not intend to have that agreement expire on May 31, 2015; otherwise, the express dispute resolution clause in that provision would have no meaning. As a result, the obligation to be bound to the Settlement Agreement's obligation to arbitrate disputes arising under Section 3.5 has not expired.

whatever the outcome, the resolution of that claim hinges on the interpretation ultimately given the contract clause providing for severance pay. The dispute therefore, although arising *after* the expiration of the collective-bargaining contract, clearly arises *under* that contract.

*Litton Fin.*, 501 U.S. at 204-05 (quoting *Nolde,* 430 U.S. at 248-49).

Here, even though the claim for monies owed came after the expiration date of the collective bargaining agreement, the dispute clearly arose under the terms found in the Parties' collective bargaining agreement, not after.  The Settlement Agreement attempted to resolve all disputes related to monies owed based upon the Parties' collective bargaining agreement from June 1, 2012 through the Settlement Agreement's execution date.  **(Meyer Decl., Exh. 2.)**  Also, the Union's own correspondence – the June 20, 2015 spreadsheet – shows that the Union is attempting to seek Trust contributions for employees in 2012 and 2013 based upon the Parties' expired collective bargaining agreement.  This dispute has clearly arisen under the terms of the June 1, 2012 – May 31, 2015 collective bargaining agreement; thus, the arbitration clause for this dispute is still alive and compulsory.

Here, even if the Court elects not to find that the Settlement Agreement is a § 301 labor agreement, the compulsory arbitration procedures in the Parties' expired collective bargaining agreement require arbitration over this dispute.

2.      **The Agreement Contains an Implied No-Strike Clause.**

As part of the federal body of common law to govern contracts between the union and the employer, the courts have concluded that the agreement to arbitrate disputes is the *quid pro quo* for an agreement not to strike.  *Textile Workers Union of America v. Lincoln Mills of Alabama*, 353 U.S. 448, 457-459 (1957).  As such, the Courts have determined that an agreement not to strike may be implied into labor agreements containing final and

*Ex Parte* **Motion for TRO - Page 17**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

binding arbitration provisions. *Gateway Coal*, 141 U.S. at 382; *Teamsters Local 174 v. Lucas Flour Co.*, 369 U.S. 95 (1962) ("A strike to settle a dispute which a collective bargaining agreement provides shall be settled exclusively and finally by compulsory arbitration constitutes a violation of the agreement."); *Boy Market,* 398 U.S. at 247-48 ("As we have previously indicated, a no-strike obligation, express or implied, is the quid pro quo for an undertaking by the employer to submit the grievance disputes to the process of arbitration."). In fact, "absent an explicit expression [to exclude the no-strike provision from the contract], the agreement to arbitrate and the duty not to strike should be construed as having coterminous application." *Gateway Coal*, 141 U.S. at 382.

This coterminous relationship is based upon the strong federal policy favoring the arbitration of labor disputes, which is firmly grounded in the Act's Congressional history. *Id.*; *see also the Steelworkers Trilogy (United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593 (1960)).

> 'Final adjustment by a method agreed upon by the Parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement.'

*Id.*

Moreover, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with **positive assurance** that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* Arbitration provides the Parties with a method for resolving "the unforeseen disagreements that inevitably arise." *Id.*

*Ex Parte* **Motion for TRO - Page 18**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

In *California Trucking Ass'n v. Teamsters Local 70*, 679 F.2d 1275 (9th Cir. 1981), the Ninth Circuit found that the union's work stoppages violated implied no-strike provisions in the multi-employer collective bargaining agreement and the supplemental agreement. Both of the agreements contained language about dispute resolution but did not contain express language that the dispute would be settled by final and binding arbitration. Despite this, the Ninth Circuit found "the presence of such an express appellation is irrelevant when the Parties' intent indicates a desire fully to arbitrate." 679 F.2d at 1286.

In fact, the Courts have consistently enforced the strong federal policy toward arbitration, and that requires a finding that the no-strike clause, with its coterminous relationship attaches. "Coterminous interpretation means that if the subject of a work stoppage is covered by the arbitration provisions of the contract, then the stoppage violates the no-strike clause." *Whitehouse & Sons Co. v. NLRB,* 659 F.2d 830 (7th Cir. 1981). Even if there is evidence that the employer knew how to write no-strike language and used no-strike language in other contracts, the Courts and the National Labor Relations Board ("Board") will not find a negative implication, absent express language indicating a desire to exclude the no-strike clause. *Mailers Union No. 6,* 139 NLRB 1092, (1962) (finding all union craft members violated their no-strike obligations in all craft contracts, even though some of the craft contracts contained no-strike clauses, and other craft contracts did not); *Lucas Flour,* 369 U.S. at 577-79 (finding implied no-strike obligation, even though current agreement did not have a no-strike clause but prior agreements had contained no-strike language, so it was evident that the parties knew how to craft no-strike language); and, *Gateway Coal,* 4141 U.S. 380 n. 10 ("[d]oubts should be resolved in favor of coverage").

*Ex Parte* **Motion for TRO - Page 19**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
**701 Fifth Avenue, Suite 4040**
**Seattle, WA  98104**
**Ph. (206) 447-0182 • Fax: (206) 622-9927**

Here, the Parties fully expressed a desire to fully resolve any dispute involving Section 3.5 through its dispute resolution procedures.  That includes mandatory, final and binding arbitration.   Even if the Court finds that the collective bargaining agreement's arbitration and no-strike obligations do not apply, the process for mandatory arbitration was incorporated by specific reference within the Parties' Settlement Agreement.  As a result, the coterminous relationship and its no-strike obligation also attach to the Settlement Agreement.

### 3. The Underlying Labor Dispute Involves a Matter that is Subjected to the Mandatory, Final and Binding Arbitration.

Here, the Parties understood that the terms of the Settlement Agreement could lead to disputes in the future.  The Parties were especially concerned about disputes found in Section 3.3 and 3.5 arising in the future.  As a result, the Parties explicitly bound themselves to the dispute resolution provision, which includes mandatory binding arbitration as the last method for resolving the dispute.  A purpose of the Union's strike action is the dispute related to payments' owed, pursuant to Section 3.5 of the Settlement Agreement.  As a result, the dispute resolution provisions found in the Settlement Agreement are triggered.  Thus, the underlying labor dispute (i.e. money allegedly owed under the Settlement Agreement) involves a matter that is subjected to the mandatory, final and binding arbitration provisions in the Settlement Agreement, as well as the Parties' collective bargaining agreement.

### 4. The Traditional Requirements of Equity – Irreparable Harm and Balance of Hardships – Require Immediate Injunctive Relief.

The traditional test for equity is incorporated into *Boys Market* and includes the traditional equity determinations as to whether an injunction is warranted.  In the context of

*Ex Parte* **Motion for TRO - Page 20**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

location-restrictive ordinances, this Circuit has determined that a preliminary injunction should issue upon a clear showing of either: (1) probable success on the merits and irreparable injury; or (2) sufficiently serious questions going to the merits to make the case a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party requesting relief. *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993) (*citing Adultworld Bookstore v. City of Fresno,* 758 F.2d 1348, 1351 (9th Cir. 1985)).

"These are not two separate two separate tests, 'but merely extremes of a single continuum.'" *Id.* (*quoting Benda v. Grand Lodge of Int'l of Machinists & Aerospace Workers,* 584 F.2d 308, 315 (9th Cir. 1978)). In assessing whether injunctive relief is appropriate, the Court has a "duty…to balance the interests of all Parties and weigh the damage to each." *See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1203 (9th Cir. 1980).

### a. *Northshore Has Shown that it Will Succeed on the Merits.*

The movant must only show that his cause presents a serious question of law worthy of litigation. *Topanga Press,* 989 F.2d at 1528. Northshore and the Union entered into a Settlement Agreement. That Agreement contained a dispute resolution clause. The dispute resolution clause incorporated by reference the Parties' final and binding arbitration procedures into the Settlement Agreement. The Parties agreed to be bound by that dispute resolution clause (including arbitration) over any disputes related to Section 3.5. Northshore and the Union have a labor dispute as to whether any monies are due and owing under Section 3.5. The dispute resolution procedures of the Settlement Agreement are triggered, including compulsory arbitration for a final determination on the merits of the dispute. The

*Ex Parte* **Motion for TRO - Page 21**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 ● Fax: (206) 622-9927

Union has now engaged in a strike against Northshore, and indicated that a reason for that strike is the dispute as to monies owed under Section 3.5 of the Settlement Agreement. This matter falls directly within the parameters of *Boys Market*, and an immediate injunction is appropriate to cease the Union's strike action. Thus, there is a strong likelihood that Northshore will succeed on the merits.

### b. *Northshore Will Suffer Immediate and Irreparable Harm If a Temporary Restraining Order is Not Entered.*

Northshore has shown that there is a significant threat of irreparable injury. Because it is likely that Northshore will prevail on the merits of its claims, the burden to show irreparable harm is substantially reduced. *Wal-Mart Stores, Inc. v. County of Clark*, 125 F. Supp. 2d 420, 429 (D. Nev. 1999).

The loss of business, business reputation and customer goodwill due to work stoppages constitutes irreparable harm. *See Otis Elevator Co. v. Local 1, Int'l Union of Elev. Constructors,* 684 F. Supp. 80, 83 (S.D.N.Y. 1998) (granting a *Boys Market* injunction, finding work stoppages were likely to damage a business irreparably by leading to a loss of goodwill and cause a permanent loss of business); *The Dannon Co., Inc. v. Whelan*, 555 F. Supp. 361, 366-67 (S.D.N.Y. 1983) ("While the actual loss of sales each day during the pendency of the walkout can adequately be redressed by monetary damages, the residual and possibly permanent effect of [the employer's] failure to consistently supply its customers cannot.").

The Union's strike action has caused immediate loss of business and revenue that continues each day of the strike. **(Meyer Decl., ¶¶ 11-13.)** Northshore has spent 25 years building its reputation and goodwill throughout the construction industry. **(*Id.*, ¶ 3.)**

*Ex Parte* Motion for TRO - Page 22
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

Northshore is currently working on multiple jobs, and there are a number of jobs expected to start in the immediate future. **(Meyer Decl., ¶ 11.)** The current jobs include work at the following construction sites: 500 Fairview; Adams Elementary; Chambers Creek Waste Water Treatment Plant; U240; Bothell City Hall; 1600 7th Avenue; Maydenbauer Center; Swedish Medical Center; Biller Residence; Alley 111; Bellevue Square South Commons; Block #45; Cat and Critter. **(Id.)** Several of the General Contractors have ordered Northshore to cease working on their jobs; some for an indefinite period of time[12]. **(Id.)**

There is significant risk that Northshore will not be able finish some of these jobs within its contractual obligations. **(Id., ¶ 12.)** Many of these jobs have tight time frames. **(Id.)** Every day that Northshore is not working significantly heightens the risk that Northshore will lose goodwill and reputation for failing to make contractual deadlines. **(Id., ¶¶ 11-13.)** General Contractors do not want to do business with a company that is entangled in a strike, and they do not want to accept bids from subcontractors that are involved in a strike. **(Id.)** General Contractors also do not want to do business with companies that do not complete projects on time, and cause work stoppages. **(Id.)** The loss of goodwill and reputation, along with the business losses, for failing to make deadlines and entangling General Contractors into a labor dispute, will cause immediate and irreparable harm to Northshore. **(Id.)**

Second, in addition to the irreparable harm, the balance of hardship clearly favors a temporary enjoinment of the Union's strike activity. Not just the Employer, but the Union also, bargained for the agreed-upon dispute resolution clause as a method of resolving all

---

[12] Even after Northshore has been directed by the General Contractors not to perform work, the Union has continued to picket those sites. This improper strike activity has caused several jobs to be completely shutdown.

*Ex Parte* **Motion for TRO - Page 23**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

disputes related to the Settlement Agreement, as well as the collective bargaining agreement. The Union is not harmed by adhering to the agreed-upon arbitration procedures in the labor agreement.  Northshore, on the contrary, suffers a significant amount of irreparable harm if the Union is permitted to continue its contractual breach by engaging in a strike in violation of the implied no-strike clause.  Thus, the balance clearly favors temporary enjoinment.

## V.    CONCLUSION

The Court should grant Northshore's *ex parte* Motion for a TRO.  Northshore will suffer an immediate and irreparable harm, if the Court does not immediately enjoin the Union's strike action.  Northshore has provided notice of this motion to the Union's counsel. The proper entities should be bound by the Court's TRO, pursuant to Fed. R. Civ. P. 65(d)(2).  Defendant should be enjoined from striking, until the District Court has rendered its decision as to whether a permanent injunction is appropriate.

Respectfully submitted this 24th day of August, 2015.

By: _____

Christopher L. Hilgenfeld, WSBA #36037
Davis Grimm Payne & Marra
701 5th Avenue, Suite 4040
Seattle, WA  98104-7097
Phone: (206) 447-0182
Fax: (206) 622-9927
Email: chilgenfeld@davisgrimmpayne.com
**Attorneys for Plaintiff**
**Northshore Sheet Metal, Inc.**

*Ex Parte* **Motion for TRO - Page 24**
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

## CERTIFICATE OF SERVICE

I hereby certify that on the _24th_ day of August, 2015, I electronically filed the foregoing **Plaintiff's *Ex Parte* Motion for a Temporary Restraining Order** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

> Mr. Daniel Hutzenbiler
> Robblee Detwiler & Black
> 2101 Fourth Avenue, Suite 1000
> Seattle, WA 98121-2317
> dhutzenbiler@unionattorneysnw.com

I further certify that a copy of the foregoing document will be served upon the following individual(s) via legal process service through ABC Legal Services at their last known address as indicated below:

> Sheet Metal Workers International Association, Local 66
> c/o Tim Carter
> 11831 Beverly Park Road, Building B-2
> Everett, WA 98204

Betsy E. Green, Legal Assistant to
Attorneys for Northshore Sheet Metal Inc.
E-mail: bgreen@davisgrimmpayne.com

*Ex Parte* Motion for TRO - Page 25
CASE NO. _____

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
Ph. (206) 447-0182 • Fax: (206) 622-9927