1        UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3  _____

4                                )
   NORTHSHORE SHEET METAL, INC.,  ) C15-01349-MJP
5                                )
                    Plaintiff,    ) SEATTLE, WASHINGTON
6                                )
   v.                            ) September 2, 2015
7                                )
   SHEET METAL WORKERS           ) TRO Hearing
8  INTERNATIONAL ASSOCIATION,     )
   LOCAL 66,                      )
9                                )
                    Defendant.    )
10                               )

11 _____

12           VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE MARSHA J. PECHMAN
              UNITED STATES DISTRICT JUDGE
13 _____

14

15 APPEARANCES:

16

17  For the Plaintiff:    Christopher Hilgenfeld
                          Davis Grimm Payne & Marra
18                        701 Fifth Avenue
                          Suite 4040
19                        Seattle, WA  98104

20

21  For the Defendant:    Daniel R. Hutzenbiler
                          Robblee Detwiler & Black
22                        2101 Fourth Avenue
                          Suite 1000
23                        Seattle, WA  98121

24

25

1          THE COURT:  Good morning.  Please be seated.

2          THE CLERK:  This is the matter of Northshore Sheet Metal

3    versus Sheet Metal Workers International Association, Local 66,

4    Cause No. C15-1349.

5       Counsel, please make your appearances.

6          MR. HILGENFELD:  Chris Hilgenfeld.  I represent the

7    plaintiff, Northshore Sheet Metal, in this matter.  Thank you.

8          MR. HUTZENBILER:  Daniel Hutzenbiler representing the

9    union, Local 66.

10         THE COURT:  Counsel, I have had an opportunity to read

11   your materials, the plaintiff's motion for the TRO, the response

12   by Sheet Metal Workers, as well as the reply and the secondary

13   documents that you supplied.  So I believe I'm ready to hear you.

14      So as you do your argument, I have a couple of questions that

15   I would like to have you address as you argue, and that is, what

16   is Local 66's strike about and where do I go to find out just

17   exactly what it is about, and what obligation does Section 7 of

18   the LaGuardia Act place upon the court; in other words, what does

19   Section 7 tell me that I must do, and what steps does Section 8

20   of the Act require a party to take before seeking a *Boys Market*

21   injunction, okay?

22         MR. HILGENFELD:  Thank you, Your Honor.

23         THE COURT:  Please go ahead.

24         MR. HILGENFELD:  Thank you.

25      May it please the court, as I stated, my name is Chris

September 2, 2015                                                3

1    Hilgenfeld, Davis Grimm Payne & Marra, and I represent Northshore

2    Sheet Metal in this matter.

3         And I will address your questions to that very quickly, but

4    first I think it's important that you at least understand a

5    little bit about Northshore Sheet Metal, and we will get into

6    that.

7         Right here is Brian Elbert and Jeff Meyer.  They're the

8    co-presidents of Northshore Sheet Metal, and they're here today.

9         This issue involves a company that's been in the Puget Sound

10   area for 25 years.  Before Jeff and Brian, their parents, their

11   dads, started this business, and in the sheet metal industry,

12   it's based in large part on your reputation and goodwill.  That's

13   how you get jobs.  It's not simply your bid and are you the

14   lowest bid; it's how you do your job, do you do a good job, do

15   you do it on time, and also, what kind of problems do you cause

16   on the job site.  And that is really what this injunction is

17   about.

18        And it doesn't just affect Northshore Sheet Metal.  It

19   affects the entire community, because it's not just Northshore

20   that's affected; it's the employees of Northshore, it's their

21   families, it's the general contractors who are also being

22   kicked -- they have subs being kicked off jobs, general

23   contractors' families.  It's the whole construction area that's

24   affected by that.  And that is really why we're seeking an

25   injunction here on *Boys Market* today.

1      Your Honor, in looking at what this is about, your first

2   question, the pickets make it very clear.  I was there at

3   Northshore yesterday, Jeff and Brian drove by today, saw the

4   pickets up.  It's about benefits.

5          THE COURT:  Well, as I understand it, you have got

6   people that are picketing, and they have the word "benefits" on

7   their signs, except that any labor negotiation of any kind is

8   always about benefits.  So how do I know that this is the right

9   kind of benefit that falls into this narrow category?  Because

10  while I appreciate that this involves a larger community,

11  Congress has been pretty clear that judges butt out of these

12  sorts of issues.

13         MR. HILGENFELD:  The issue here -- and this is where

14  it's different than most cases that would come before you -- we

15  have been bargaining for a successor agreement.  As Mr. Meyer's

16  declaration stated, we have agreed to retroactivity for wages and

17  benefits.  In fact, we have already been paying increased

18  benefits for it before.  There is no disagreement about what

19  Northshore owes going forward.  And that's usually what you will

20  see a strike over, is what the employer is going to pay going

21  forward, in the next contract.  We have already agreed to that.

22  And if you look in the union's response, there is really no

23  contest to that's what the issue is about.  It's about the

24  benefits outlined in Section 3.5 of the settlement agreement.

25  That's the only benefits at issue.  There aren't any others.  And

```
 1   that's where this case is a little different.
 2       And the union, in their letters that are before the court,
 3   said, you owe benefits because there are 401(k) contributions we
 4   believe are owed pursuant to 3.5.
 5            THE COURT:  Now, you exchanged a series of information,
 6   and by the time that you filed your papers, you had asked -- I
 7   will put it in shorthand -- you know, why do we owe it, who do we
 8   owe it to, how much do we owe.  Have you gotten any further
 9   responses?
10            MR. HILGENFELD:  We have not, Your Honor.
11            THE COURT:  Okay.
12            MR. HILGENFELD:  The only thing we have received, the
13   court has received.
14            THE COURT:  Okay.  All right.  Go ahead.
15            MR. HILGENFELD:  So that's why this is different.
16       And the board is very clear, the National Labor Relations
17   Board, that when you are looking at what's the strike over, the
18   first place you go to are the picket signs, and those picket
19   signs speak louder than any other self-serving declaration or
20   anything else.
21       And another issue for the court on that issue, the issue is
22   not what's the primary reason; it's is the benefits issue in the
23   settlement agreement an object.  An object.  It doesn't have to
24   be the sole object.  It doesn't even have to be the primary one,
25   although we think it is.  It just has to be an object.
```

1      This is very similar to issues where the board and the courts

2   have looked at secondary boycott activity or other types of

3   activity where you have an illegitimate purpose and you have a

4   legitimate purpose.  And the unions sometimes try to hide the

5   illegitimate purpose within the legitimate.  And the courts

6   consistently -- it's a regular routine to say, if there is an

7   objective that's illegitimate, an injunction is proper.  And that

8   here, by the strike signs, it is very clear that's a purpose.

9          THE COURT:  So what's to keep the union from basically

10  taking those signs down and telling their membership, don't use

11  the ones that say "benefits"; use the ones that say "Northshore

12  Sheet Metal is Unfair"?

13         MR. HILGENFELD:  What this is, part of the injunction, a

14  part of what the courts do -- and I think that's a very good

15  point -- is when you seek an injunction, you are really stopping

16  the unlawful conduct.  And to do that, absent some other type of

17  change that occurs -- there's been no change in their purpose --

18  the board has consistently said, and the courts have consistently

19  found, that it is perfectly appropriate to say, you have to cut

20  out all strike activity because there was an illegitimate

21  purpose.

22     There's a case -- and that also goes into your next point

23  about Section 7 rights.  And that's, really, in our opinion, the

24  concern about the breadth of any injunction, is protecting the

25  Section 7 rights, but also protecting the employer and the

1   no-strike contractual obligations.  And this isn't unique either

2   for the courts.  The courts do enjoin Section 7 rights dealing

3   with peaceful picketing.  In fact, I thought it was cited.  And I

4   apologize.  I couldn't find it last night when I was looking at

5   it.  But I do have another case for you, if I may approach.

6           THE COURT:  All right.

7           MR. HILGENFELD:  And, Your Honor, this is not a *Boys*

8   *Market* case.  But I think it's important for the court that this

9   is a case before the Supreme Court that was dealing with peaceful

10  picketing.  It was dealing with Section 7 rights.  And it was

11  dealing with issues where you had an illegitimate purpose and a

12  legitimate purpose.  And they said, and the court found, that

13  when you are designing the injunction, it's appropriate to take

14  all those considerations in place to make sure -- and these are

15  my words, not the court's -- but to make sure that the injunction

16  stops the illegitimate purpose.  Because that's the true reason

17  we are here, is to make sure that the union members don't go back

18  home, turn around their picket signs, and are back out again.  No

19  matter what the picket signs are saying, they have publicized it

20  to such a degree that that's what it's about.

21      And when you look at the true purpose right now, Your Honor,

22  there's only two issues between the parties.  There's the one

23  they brought up in Mr. Carter's declaration -- there's two issues

24  he brought up.  One was a shop steward, and we resolved that.

25  And that letter is before the court.  But then the second is the

1    extra-territorial issue.  And so when you are looking at what the

2    breadth of the injunction should be, look at what the union says

3    that they think they should be striking over.  One is this

4    extra-territorial issue that does not affect Local 66 members; it

5    does not affect Local 66 jurisdictional work.  It's for work in

6    other parts of the country.  It doesn't affect these local

7    people.  And when you are dealing with the construction industry,

8    most of Northshore's clients are regional.  Striking a regional

9    company that does business in Western Washington over whether

10   Northshore should be doing business in Hawaii, that's not

11   connected.

12      And then that brings us to the second issue, and that's the

13   benefits issue, per the settlement agreement.  Northshore

14   steadfastly maintains everyone was paid appropriately.  But we

15   recognize this issue involves thousands and thousands and

16   thousands of dollars of Local 66 members' retirement.  That

17   affects these members, absolutely.  That affects Western

18   Washington.  That affects Local 66.  That is really the true

19   basis of what we are seeking to enjoin.  And that issue has an

20   implied no-strike agreement.  And the parties have agreed to it.

21   And whether you find that the collective bargaining agreement or

22   whether the settlement agreement applies, in either case, it has

23   binding arbitration.

24      Now, we feel strongly that the court should use the

25   settlement agreement, but the primary purpose is, the settlement

 1   agreement actually had extra protections, because we want to go

 2   to mandatory mediation as well, because that's the

 3   "bargained-for" that the parties agreed upon.

 4          THE COURT:  Can I give you what you want without having

 5   a hearing?

 6          MR. HILGENFELD:  Without having what?

 7          THE COURT:  A hearing, where I take testimony.

 8          MR. HILGENFELD:  I believe we're prepared to put

 9   testimony on today.  We think there's sufficient evidence out

10   there.  If the union would like to cross-examine or anything

11   else, then we're -- it's perfectly appropriate for that.  I think

12   that can occur right here.  I think the documentary evidence is

13   sufficient.  But if the union feels they would like to

14   cross-examine Mr. Meyer, we will make that available.

15          THE COURT:  All right.  What else would you like to have

16   me know?

17          MR. HILGENFELD:  I believe the last question was with

18   regard -- I think we have gone through the others, but the

19   procedural questions you had regarding the Norris-LaGuardia Act,

20   I think *Boys Market* and the progeny after that are clear that --

21   Norris-LaGuardia, we're not saying it doesn't apply, but it

22   applies to the extent that it still maintains the focus and

23   preserves the national policy in favor of arbitration.  And we

24   believe all those steps have been met, and we kind of go through

25   those in our reply brief.  Most of them, (b), (c), (d), they're

1   the traditional equity principles that apply.  We think that's

2   been fully met in this case.  Equity demands an injunction in

3   this case.

4       Section (a), *Boys Market* addresses that in that case.  And so

5   *Boys Market* says, look, when you have a contractual provision

6   that requires arbitration, and a party strikes over that, whether

7   it's an explicit no-strike or an implied no-strike, that other

8   side has been harmed to a degree that an injunction is

9   appropriate.

10      And then (e), we have addressed, and we have provided letters

11  to the court from the police.  I think it's fully -- we're not --

12  the problem with Norris-LaGuardia is, it doesn't match exactly.

13  It's not intended to match exactly with this case.  And the cases

14  that have kind of looked at *Boys Market* look at *Boys Market* as

15  designed to promote arbitration.  Norris-LaGuardia was really

16  designed to promote strike or violence and misconduct on the

17  picket line.

18          THE COURT:  It wasn't designed to promote it; it was

19  designed to prevent it.

20          MR. HILGENFELD:  Thank you.  Yes.  Sorry.  I was

21  inaccurate.

22      So looking at the meaning, we think the court can certainly

23  make a judicial determination the police force isn't going to

24  come out and stop peaceful picketing that otherwise doesn't

25  violate the law.  It doesn't violate criminal laws, I should say.

1    But just because it doesn't violate criminal laws, that doesn't

2    mean it doesn't violate our other national requirements and the

3    contractual obligations not to strike.  So the court has to make

4    that balancing test, and we provide sufficient information on

5    that.

6        And then the last is Section (a).  We have taken all the

7    steps about trying to get the information, about trying to

8    resolve this dispute.  We're perfectly willing to go to mediation

9    at any point.  We do need the information to make determinations

10   and decisions when we do it.  But the key case in this is, I

11   believe --

12           THE COURT:  Do I have the power to order them to give it

13   to you?

14           MR. HILGENFELD:  Yes.  Well, I should rephrase that.  I

15   believe you have the power to order mediation.  And for the power

16   to get documents, I believe that we may have to go through the

17   National Labor Relations Board and file a ULP for that.  I think

18   that might be the appropriate way to go.

19       But I think you have the power to order mediation and you

20   have the power to take all the steps to get to that process.  And

21   I think you have the power to enjoin any strike activity until

22   mediation has occurred.  And if the parties don't have the

23   information, can't go to mediation, the union is going to be in

24   the position that they want to give us that document sooner

25   rather than later.  And that's really what we want.

1        And then the part, though, about Section 8, I just -- this is

2    in our briefing as well.  I'm sure you have looked at it.  When

3    the union violated the contractual no-strike clause, they

4    repudiated the agreement.  And we believe that *Sidhu* -- I

5    apologize if I'm mispronouncing that -- a Ninth Circuit case,

6    talks about when you repudiate the agreement, Section 8 of the

7    Norris-LaGuardia Act, you can't go back and say, hey, you guys

8    should have arbitrated, because Section 8 really concerns -- it

9    is the clean-hands provision.  It's concerned about what did the

10   parties do to resolve their differences without getting the court

11   involved.  And we have always maintained we're willing to

12   peacefully resolve our differences, and we believe we should

13   through the mediation and arbitration process.  So I believe it's

14   been repudiated by the union with their conduct.  And so Section

15   8 has been met, based on those grounds.

16        THE COURT:  What can you tell me about the concept of

17   who binds the union?  In other words, is it a single picketer out

18   there with a sign that says, "Give me my benefits," or is it the

19   hierarchy of representation from the union?

20        MR. HILGENFELD:  Well, it's going to depend on the

21   context of all the facts surrounding the case.  And I'm not going

22   to say that every wildcat strike or a single picketer who goes

23   out on their own and strikes binds the union, because I don't

24   think that's necessarily the case, if there's some circumstances

25   where there may be an implication or an implied duty by the

1    union.  But here, the union authorized a strike.  The union sent

2    the members out.  And looking at the correspondence, the union

3    has made it clear they're going to continue to strike.  And, in

4    fact, the parties are continuing to work on the bargaining

5    obligations.  And we believe we're close.  But they're going to

6    continue to be out there to strike, and that is what we really

7    need to stop.

8              THE COURT:  Well, let's go back to what the strike is

9    about, and how do I find that out, without having a hearing,

10   where you get to put on the union representatives and say, you

11   know, under oath, what has your membership voted on, what are the

12   purposes for the strike, does it include the other benefits or

13   not.  Because, quite honestly, the materials back and forth are

14   very vague, as many of them are a rally cry for the strike, but

15   they don't explicitly say this is the reason why we're striking.

16             MR. HILGENFELD:  It goes back to a couple of things,

17   Your Honor.  One, you don't have to have the reason.  *Denver*

18   *Construction* is very clear, and it was a secondary boycott, but

19   some of the other cases that have issued injunctions for *Boys*

20   *Market*, such as *Otis Elevator*, they followed the same language in

21   issuing them.  It's whether it's an objective.  And the board has

22   stated -- and the National Labor Relations Board is the entity

23   for making these determinations and policies on how we determine

24   to find out what an objective is.  And the board has consistently

25   found, picket signs speak louder than words.  And the board all

1    the time, and the courts have consistently said, when they

2    advertise, "we're striking over benefits," that's what they're

3    striking over.  And Mr. Carter's declaration is fairly artful,

4    but you will notice he never says that's not a reason they're not

5    striking.  In fact, he says they discussed it with their

6    membership.  He just downplays it in his declaration.  In his

7    declaration alone, with the picket signs, that is absolutely an

8    objective of this strike.

9            THE COURT:  What do I do with the timing of the various

10   demands?  Is there something -- there's a temporal quality here.

11   You know, they make the demand, you go back and forth, and then

12   they strike.  Does the case law support the temporal quality to

13   say, yes, this is what they're striking about, because this is

14   what they were complaining about?

15           MR. HILGENFELD:  What the board case law says is, they

16   take all facts into consideration.  You are going to take

17   temporal proximity, you are going to take the fact they talked

18   about it at the bargaining table.  These were demands they made

19   at the bargaining table and we put before you.  You are going to

20   talk them about at the strike authorization.  They talked about

21   benefits at the strike authorization.  And then you are going to

22   say, when they actually went to strike, they held up signs saying

23   we're striking over benefits.  All of that paints the picture,

24   and that's what they rely on to issue injunctions and seek

25   injunctions.

1          And so we think the court -- and the courts have done this,

2    and the board has done this.  You keep your eyes open.  You look.

3    What are the parties doing?  What are they saying?  You have

4    letters that gradually escalate; then they mention it to their

5    membership; then they have a strike-authorization vote; then they

6    say -- the picket signs say we're striking over benefits; then we

7    say, hey, you can't do that, there's a no-strike provision; they

8    say, we're going to do it anyway, that's what we're striking

9    over, and oh, yeah, we have other reasons we may be striking.

10   But they don't list it in their letter, they don't list it for

11   the court, because they want to be able to go back and turn

12   around their pickets.  And that's why, when the court has looked

13   at wrapping a legitimate purpose within an illegitimate one,

14   that's why it's "an" objective.  You don't need to find the sole

15   reason.  And, in fact, it would be impossible, in most strike

16   scenarios, to find a sole reason.  That's why they don't do it.

17          And so I think the case law absolutely supports that the

18   proper determination is looking at all the facts, planning up to

19   the strike, and the picket signs, and putting it all together and

20   saying, yeah, that was an objective, and union, what you cannot

21   do, you cannot thumb your nose at the court, you cannot thumb

22   your nose at the LRB, and go on strike.

23          And what they have also said in their correspondence -- and I

24   absolutely agree there's a large amount of rhetoric to all of

25   that that's going back and forth -- but I think it's telling

1    that, when looking at the statements about going to the board and

2    getting injunctions, there's not going to be any money damages;

3    you are not going to be any worse off than you are today; there's

4    nothing you can do; there's nothing they can do.  That's telling.

5    And when you put all of those factors together, it's absolutely

6    telling that the intent is to continue with this, what we

7    consider an unlawful strike.

8        Force the union to go back and adhere to its contractual

9    promise, and that's what an injunction needs to do in this case.

10            THE COURT:  Thank you.

11            MR. HILGENFELD:  Thank you.

12            MR. HUTZENBILER:  May it please the court, my name is

13   Dan Hutzenbiler, as I stated earlier, representing Local 66.

14       I will try to address those first couple of issues that you

15   raised at the outset:  What is the strike about?  Where do we

16   look to find out?

17       I think Mr. Carter's declaration makes clear that the

18   strike-authorization vote that occurred, the vast majority of

19   what was discussed was bargaining, and this extra-territorial

20   language that the parties have a dispute about, whether it's

21   permissive or mandatory.  But that was the basis.  There is also

22   the underlying fringe benefit issue.  That was also discussed

23   there, but that was not the primary basis.  It was most assuredly

24   a secondary basis.  Not only -- I will say, Northshore would like

25   to try to discredit Mr. Carter's declaration in that regard, but

1    it doesn't provide any real evidence that rebuts his declaration

2    about what occurred at the strike-authorization vote.

3    Regardless, the court doesn't need to rely solely on Mr. Carter's

4    testimony to know what the basis for the strike is.

5        Northshore's own Exhibit 9, a letter from Mr. Hilgenfeld to

6    myself and Mr. Carter, states, "The employer believes one of the

7    union's objectives in striking continues to be to force the

8    employer to accept the union's proposal regarding work outside of

9    Local 66's jurisdiction with non-bargaining unit members, i.e., a

10   permissive subject of bargaining."

11       In addition, on the same date -- or I had received it, I

12   think, on the same date that Northshore filed for this temporary

13   restraining order and the lawsuit, a charge filed with the

14   National Labor Relations Board by Northshore, Mr. Hilgenfeld,

15   that states that the union has also violated 8(b)(3) of the

16   National Labor Relations Act by engaging in a strike over a

17   permissive subject of bargaining.  And I have brought copies if

18   you would like to take judicial notice of the charges.

19       So I think there's no dispute that at least an element, and

20   the primary element or basis for the strike, is, most assuredly,

21   not the benefits issue, but the bargaining issues.

22           THE COURT:  Then why don't your signs say that?

23           MR. HUTZENBILER:  Some do.  You said that Northshore --

24   why can't the union just go and have signs that say, "Northshore

25   Sheet Metal Unfair"?  That's exactly what at least half the signs

 1    say.  Only some of the signs make any references to benefits.

 2            THE COURT:  Well, if you have got an impermissible

 3    reason coupled with a permissible one, what is a poor judge to do

 4    about that?

 5            MR. HUTZENBILER:  The court should look to actual

 6    binding Ninth Circuit precedent, the *Hardline* decision, *Hardline*

 7    *Electric* and *Donovan Construction*, both of which make clear that

 8    the court can go no further than enjoining the unlawful

 9    impermissible reason for a strike.

10        Let me find that.  In *Hardline*, for example, the Ninth

11    Circuit struck down an injunction issued by the district court

12    that went beyond restricting the union's strike over an

13    arbitrable issue, and further prevented the union from, quote,

14    otherwise engaging in economic action.  The court said -- the

15    Ninth Circuit said that the district court cannot do that.  In

16    *Donovan*, the Ninth Circuit held, quote, if the scope of the

17    injunction is so broad as to enjoin union activity in situations

18    that the court could not have found suitable for *Boys Market*

19    relief because of the paucity of factual support for the

20    necessary findings, the injunction crosses the jurisdictional

21    boundary of the Norris-LaGuardia Act.  Both of those cases very,

22    I think, clearly say that an injunction under *Boys Market* can

23    only apply to the impermissible strike activity, if it's found to

24    be impermissible.

25            THE COURT:  So is striking over benefits impermissible?

1       MR. HUTZENBILER:  I think there's a dispute about that

2   as well.  The parties' contract has expired.  We believe the

3   dispute arose after the expiration of the contract.  It was in

4   July that Northshore received notice that there was an issue with

5   the benefits, according to the union's membership.  And it was in

6   July that they rejected that.  The contract expired June 1.  So

7   it was our belief that, you know, the dispute arose after.  And

8   if that's the case, then the arbitration provision is not

9   enforceable.

10      THE COURT:  When were the benefits supposed to be

11  computed?  I mean --

12      MR. HUTZENBILER:  What's that?

13      THE COURT:  You are basically complaining that they

14  didn't receive their payments into their trust funds.  When were

15  those supposed to -- if they had done everything perfectly, when

16  were those payments supposed to be made?

17      MR. HUTZENBILER:  They made multiple payments over a

18  several-month period.  I think the contributions were from 2012,

19  2013, maybe 2014.

20      THE COURT:  So within the period of the contract?

21      MR. HUTZENBILER:  Yes.

22      THE COURT:  Okay.  So what if I were to tell you, I

23  don't buy your argument --

24      MR. HUTZENBILER:  Sure.

25      THE COURT:  -- that it falls outside.

September 2, 2015

1          MR. HUTZENBILER:  Well, then we would go arbitrate it,

2   or at least mediate it.  But I will also say -- and this relates

3   to your question about Section 8 of the Norris-LaGuardia Act --

4   it requires the party seeking an injunction to have done

5   everything possible to get the matter resolved.

6       If I may, I would like to read it again.  Okay.  Section 108

7   states that a party seeking an injunction --

8          THE COURT:  You need to slow down.  I can't get a record

9   on you.

10         MR. HUTZENBILER:  Sorry about that.

11         THE COURT:  Nor can I absorb it intellectually.

12         MR. HUTZENBILER:  I have so many things going on in

13  here.

14         THE COURT:  Okay.  Well, slow it down, because you have

15  to teach this to me.

16         MR. HUTZENBILER:  Section 108 states that a party

17  seeking an injunction must demonstrate that it has made every

18  reasonable effort to resolve the disputed issue, and that

19  includes, quote, seeking the aid of any available governmental

20  machinery of mediation or voluntary arbitration.

21      While Northshore has sent letters to us requesting

22  information, you have just heard their counsel state he's not

23  sought recourse through the NLRB to get that information.

24         THE COURT:  Why does he have to do that when he can ask

25  you for it?  And why aren't you giving it?

1           MR. HUTZENBILER:  Well, we believe we have given them

2    everything that they need.  We gave them a massive spreadsheet

3    that demonstrates, by name, each of the individuals that worked

4    at Northshore during this time frame, what they were paid by

5    Northshore for the hours that they worked, and what they are

6    owed, based on those calculations.  We think that demonstrates,

7    pretty clearly -- I don't know what else to provide them.

8           THE COURT:  Well, what about the backup data?  If you

9    have only given them the spreadsheet, where did you get the

10   information to put in the spreadsheet?

11          MR. HUTZENBILER:  From Northshore.  We used the records

12   that they gave to us to calculate that.

13          THE COURT:  Then why don't you tell them that and say,

14   this is where we got the information, this is who put the

15   spreadsheet together?

16          MR. HUTZENBILER:  I believe we have told them that.

17   That's how we came up with the calculations.  We took the

18   information from them.  I believe the communication that we sent

19   them with regard to that says that.

20          THE COURT:  Well, this is why I'm scratching my head,

21   basically saying, you know, if people are owed things, they seem

22   to be willing to basically go arbitrate it and see if that's

23   true.  Why wouldn't your membership want to go that route and

24   have that done, as soon as possible?

25          MR. HUTZENBILER:  Well, we have been trying to get the

1   contract finished.  And there's been a lot of -- I mean, frankly,

2   we're talking about a hundred employees.  There's been quite a

3   bit ongoing with Northshore.  Again, they have not made any --

4   they have not requested arbitration; they have not requested

5   mediation.

6           THE COURT:  Well, they're here standing in court

7   today --

8           MR. HUTZENBILER:  I know.

9           THE COURT:  -- saying, Judge, we will go mediate this,

10  we will go arbitrate this.  So what am I to do?

11          MR. HUTZENBILER:  But they haven't said that to the

12  FMCS.  They haven't done anything.  They haven't done any of the

13  steps required by Section 8.

14          THE COURT:  Well, standing up in open court and telling

15  a federal judge that's what you want to do seems to be a pretty

16  good announcement to me.  And I'm wondering why you are not

17  jumping on it and saying, let's go do it.

18          MR. HUTZENBILER:  Well, one, we will go arbitrate and

19  mediate this dispute.

20          THE COURT:  Okay.  So I don't have an issue anymore with

21  that?

22          MR. HUTZENBILER:  No, no.

23          THE COURT:  Okay.  So is there any reason why your

24  picket line has to say, we're striking over benefits?

25          MR. HUTZENBILER:  No.  We can change that.  No.

```
 1        Again, the issues that led to this strike, primarily, were

 2   the bargaining issues.  It just so happened that the cutoff date

 3   for filing with Northshore about the benefits issue coincided

 4   with bargaining.  It occurred at the same time frame.  So, in our

 5   mind, the members hadn't been paid benefits as well.  But that

 6   was not the primary basis for the strike.

 7        If I may, I would like to address some of the case law that

 8   counsel referred to.

 9             THE COURT:  Let me ask you one more question.

10             MR. HUTZENBILER:  Sure.

11             THE COURT:  Do I have the power to order you to go

12   arbitrate?

13             MR. HUTZENBILER:  Yes.  Yes.

14             THE COURT:  Okay.  Go ahead.

15             MR. HUTZENBILER:  Although I will say, I think the first

16   step would be mediation, if we were --

17             THE COURT:  Whatever.

18             MR. HUTZENBILER:  Okay.

19             THE COURT:  Some alternative form of dispute resolution.

20             MR. HUTZENBILER:  Sure.  Yes, I think you do.  I think

21   you would have that power to tell us to go mediate, arbitrate,

22   whatever.  But I don't believe that that power then allows you to

23   preclude our picketing, our picketing over bargaining subjects.

24   That's not subject to the grievance procedure, and it was

25   clearly, as acknowledged by Northshore in both letter and -- to
```

1    the NLRB, it was the basis for, and the primary basis, for the

2    strike itself.

3          Now, there was a lot of discussion about case law involving

4    secondary boycotts and how you can look to both the overt, lawful

5    objective and the unlawful objective, and you can kind of

6    consider -- you can enjoin the entirety.  I believe under Ninth

7    Circuit precedent, *Hardline* and *Donovan,* you are precluded from

8    that.  Northshore cited no binding Ninth Circuit case that says

9    that these secondary boycott cases that allow for that analysis

10   somehow allow this court to provide a broader injunction.  It

11   goes against the strictures of the *Boys Market* line of cases.

12   The Ninth Circuit has said, very clearly, any *Boys Market*

13   injunction must be narrowly drawn.  You can't enjoin other

14   economic-activity picketing in doing that.  And I will say

15   there's a reason for that.

16         So there's a separate statutory grant of authority to the

17   NLRB to seek injunctive relief in those secondary boycott cases

18   cited by Northshore.  That's 29 U.S.C. Section 160(l).  Under

19   that statute, the board can seek what is commonly known as a

20   10(l) injunction, but the Supreme Court has explicitly held that

21   the Norris-LaGuardia Act is not applicable to those 10(l)

22   proceedings.  So we're looking at -- you know, it's not apples

23   and oranges.  Or it is apples and oranges, I should say.  It's

24   not apples to apples.

25         In *Bakery Sales Drivers Local Union No. 33 v. Wagshal*, 333

1    U.S. 437, the court held that the Norris-LaGuardia Act, quote,

2    had been changed only where an injunction is sought by the

3    National Labor Relations Board, not where proceedings are

4    instituted by a private party.  That's what we have here, is, you

5    know, proceedings instituted by a private party.

6         Those secondary boycott cases are inconsistent with both

7    *Hardline* and *Donovan* that say you cannot go further and enjoin

8    activity that the union could otherwise engage in, that is not

9    subject to the arbitration procedure.

10        So if the court is inclined to grant an injunction, we

11   believe that it can only limit picketing activity related to the

12   fringe benefits issue; not picketing activity related to the

13   bargaining issues, which, again, are the primary basis for this.

14        THE COURT:  If you really want to strike a bargain,

15   isn't picketing and striking counterintuitive?

16        MR. HUTZENBILER:  Generally, it's a last resort.  It is

17   absolutely a last resort.  But as we have seen in cases, it often

18   does bring parties -- employers that are not inclined to agree,

19   it does bring them to an agreement.  I have seen it.  I represent

20   a number of trades, and it has been effective when used properly.

21   It's an absolute last resort.

22        THE COURT:  So explain to me -- you are using the words

23   "bargaining."

24        MR. HUTZENBILER:  Yes.

25        THE COURT:  And they're using the words "jurisdictional

1    issues," and claim that that really doesn't affect Local 66.

2              MR. HUTZENBILER:  Uh-huh.

3              THE COURT:  So which is it, and how am I supposed to

4    figure that out?

5              MR. HUTZENBILER:  Well, I think they're interrelated.

6    We are bargaining over an issue.  There's a contract provision --

7    well, let me take a step back.

8         The Sheet Metal Workers International Union creates what's

9    called a standard form of union agreement.  It has a number of

10   provisions that they have across the country.  Okay.  One of

11   those provisions is what they refer to as the extra-territorial

12   language that states if Northshore goes and works in Portland or

13   anywhere else where there's a sheet metal workers' contract in

14   place, they're going to abide by the terms and conditions of that

15   contract when they go there.  That's what the parties are

16   bargaining about.  And that's really the main -- final issue on

17   the table.  And I agree with Mr. Hilgenfeld.  I think the parties

18   are close.  But it's not jurisdiction in the sense of this

19   court's jurisdiction.  It's bargaining over a particular issue

20   that relates to when they travel outside of the union's

21   jurisdiction.

22             THE COURT:  And that's really what your local goes out

23   and strikes for, is that particular issue?

24             MR. HUTZENBILER:  Yes.  While there are a number of

25   important issues, the union has decided, as it's allowed to do,

1   that this one is not something that they're going to give up.

2   This language is in every sheet metal contract across the

3   country.  Every sheet metal contractor in Local 66's jurisdiction

4   has it.  If Local 66 does not fight for this, then other locals

5   may not either, and it will affect us when employers come into

6   our territory, and it could affect our members if they are

7   working and traveling in another jurisdiction.  So it's something

8   that the local has chosen to fight.

9        THE COURT:  Okay.  So let me understand it.  In its

10  broadest terms then, it isn't necessarily about dollars in each

11  local member's pockets; it's more about hanging together so that

12  unions across the country can hang onto their bargaining

13  positions?

14       MR. HUTZENBILER:  Yeah, I think that's a pretty fair

15  characterization.  I mean, at the end of the day, I do think it

16  affects what's in their pocket as well, because if they lose

17  this, and then others lose this, then, you know, they're going to

18  lose the market share that they have.

19       THE COURT:  Okay.  What else would you like to argue

20  today?

21       MR. HUTZENBILER:  I just would like to make sure -- if I

22  could take just a moment to determine whether there was anything

23  else that I wanted to go over?

24    I don't have anything further at this time.  If I have time

25  remaining, I would like to reserve it for any rebuttal, if I have

 1    any.

 2              THE COURT:  You don't.  It goes this way.  It's his

 3    motion.  He gets to argue twice.  You get to argue once.

 4              MR. HUTZENBILER:  Fair enough.

 5         Did you want a copy of the charge that I referenced?

 6              THE COURT:  If you would like to give it to me, sure.

 7              MR. HUTZENBILER:  I would like to.

 8              THE COURT:  Okay, counsel.  I just heard him say that

 9    he's willing to go to mediation on those issues.

10              MR. HILGENFELD:  I heard that as well, and we're pleased

11    for that, Your Honor.

12              THE COURT:  Okay.

13              MR. HILGENFELD:  That doesn't relieve our --

14              THE COURT:  I understand that's not all you want, but --

15              MR. HILGENFELD:  That's a good place to start.

16              THE COURT:  Okay.

17              MR. HILGENFELD:  But I will say, we have never said this

18    was the sole reason they have gone out.  We believe there's two

19    unlawful objectives.  We have been pretty clear in that

20    throughout the whole process.

21         I do think it's important to note a couple of issues.  They

22    have cited *Hardline.*  Please look at that case.  Because in that

23    case the employer acknowledged that they were trying to force

24    arbitration on a non-arbitrable issue.  That's not what is

25    happening here.  *Hardline* is not the appropriate analysis for

1    determining the scope of the *Boys Market* injunction.

2         And then also look at *Donovan* and look at the language in

3    *Donovan*.  And, in fact, it's talking about the Ninth Circuit

4    saying, look, we acknowledge that, in certain cases, an

5    injunction about future conduct may be appropriate as the facts

6    dictate.  The facts in that case didn't dictate, and it wasn't

7    limited to an injunction that was focused on a basis being an

8    objective of the strike.

9         And we absolutely believe, and the courts, in issuing *Boys*

10   *Market* injunctions, have found that when it's issuing an

11   injunction, when it talks about an object of the strike, the key

12   ingredient is that the union can't turn around the pickets and

13   come back out.  And in that sense, the analysis in looking at --

14   because what they're looking at in secondary boycotts is, what is

15   the motive, what should we be enjoining?  And that's the analysis

16   we think would be helpful.  *Denver Trades* does it, but then

17   there's some other cases that have been cited.  *South Ohio Coal*,

18   which is about a prospective enjoinment, is appropriate.

19        The key determination is, is an object of the strike

20   benefits, and if it is, we need to take all action to stop that.

21   If they want to go picket other sites where we're doing work

22   outside of Western Washington, have at it.  If they're focused on

23   that work, that's where the pickets would be appropriate.  That's

24   not where they're doing it, though.  They're doing it where

25   there's local members here, where they're informing them, we're

1  fighting for your rights over the benefits.  And that's what an

2  objective is.  And a complete prohibition of this activity,

3  absent any changes, is perfectly appropriate in this case.

4      And I would also just like -- and we put this in.  I'm sure

5  it was looked at by the court.  But looking at the orders of

6  other courts that have issued *Boys Market* injunctions that are

7  cited, *Otis Elevator*, *New York Times*, they're both cited in the

8  briefing papers, would, we believe, be a proper method for

9  determining that we're going to issue an injunction to stop the

10  strike activity.  And if something else comes up where the union

11  can prove it's not striking over that issue, then maybe we have a

12  different story.  But that's never been the case.  They have

13  always been tied.  And if you look at our briefs, we actually

14  tried to separate them.  Not our briefs.  Excuse me.  Our

15  correspondence.  We say, why do you keep bringing up this issue

16  in bargaining regarding benefits, and they very clearly said, we

17  will bring it up whenever we want to bring it up, and then they

18  escalate it to a strike.

19      If Your Honor has any further questions, I would be happy to

20  answer them.  Otherwise, I have probably taken up enough of your

21  time.

22          THE COURT:  Okay.  I don't.

23          MR. HILGENFELD:  Thank you, Your Honor.

24          THE COURT:  All right.  I am very aware that these

25  parties have litigated many times here in the Western District of

1    Washington.  I'm not the first judge here to have to touch this.

2        Now, I am not going to be able to get an order out until

3    probably the end of business on Friday.  You have given me new

4    cases to look at, you have given me arguments to consider, and I

5    want to be thoughtful and careful about that.  But that delay

6    does, in fact, allow you some room.  Because what I heard you

7    here today say is that yes, you will go mediate on these benefits

8    and you will cooperate in getting the information back and forth.

9    And if that's the case, then those picket lines have to take down

10   that they're complaining about benefits.  So if that's your

11   start, what I suggest, and firmly suggest, to you, is that why

12   don't you spend some additional time to see if you can resolve

13   some of these other issues.  Otherwise, I don't know that I'm

14   going to make either one of you happy come Friday afternoon.  So

15   that's my nudge.  And look for an opinion out by the close of

16   business, okay?  Anything else I can help you with?

17           MR. HILGENFELD:  No.

18           MR. HUTZENBILER:  I don't think so.

19           THE COURT:  Okay.  Thank you.

20           MR. HUTZENBILER:  Thank you.

21           MR. HILGENFELD:  Thank you, Your Honor.

22                   (Proceedings adjourned.)

23

24

25

# C E R T I F I C A T E

       I, Nickoline M. Drury, RMR, CRR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

       I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


               /s/ Nickoline Drury

               Nickoline Drury
               OFFICIAL COURT REPORTER