Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| NORTHSHORE SHEET METAL, INC., | Case No. 2:15-cv-01349 BJR |
| Plaintiff, | ***PLAINTIFF'S SECOND AMENDED COMPLAINT*** |
| v. | **JURY DEMAND** |
| SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, LOCAL 66, | |
| Defendant. | |

Plaintiff complains, and for its cause of action against Defendant, alleges as follows:

## I.   JURISDICTION AND VENUE

1.     Plaintiff claims for relief, pursuant to 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §187(b) and the Court having jurisdiction thereunder. Plaintiff's additional claims, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26, also provide the court with jurisdiction thereunder.  *See also* 28 U.S.C. §§ 1331, 1337.

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 1
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 ● Fax: (206) 622-9927

2.      Venue is proper in this Court because the matter giving rise to this complaint affects a labor agreement negotiated within this judicial district, and has impact on employees within the judicial district, 29 U.S.C. § 187(b).  Venue is further proper in this district, pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and pursuant to 28 U.S.C. § 1391, because defendants transact business, are found in this district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## II.      PARTIES

3.      Plaintiff Northshore Sheet Metal, Inc. ("Plaintiff" or "Northshore") is an employer in the architectural metal siding industry.  Northshore is a Washington corporation doing business in Snohomish County, Washington.  Northshore is a corporation engaged in an industry affecting commerce as defined by the LMRA.

4.      Defendant Sheet Metal Workers International Association, Local 66 ("Defendant" or "Union") is a labor organization with its principal place of business in Snohomish County, Washington.  It represents collective bargaining unit persons engaged in the construction industry.  That industry affects commerce within the meaning of the National Labor Relations Act, 29 U.S.C. §§ 142(1), 152(5).

## III.      TRADE, COMMERCE AND RELEVANT MARKET AREA

5.      Defendant is engaged in, and its activities substantially affect the continuous and uninterrupted flow of interstate commerce throughout the United States.

6.      The relevant service market affected by Defendant's illegal actions consist of the following: manufacture, fabrication, assembling, handling, erection, installation,

*PLAINTIFF'S SECOND AMENDED
COMPLAINT* - Page 2
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
**701 Fifth Avenue, Suite 4040**
**Seattle, WA  98104**
**Ph. (206) 447-0182 ● Fax: (206) 622-9927**

dismantling, adjustment, alteration, repairing and servicing of all architectural metal siding and cladding work (referred to as "architectural metal siding").

7.     The relevant geographic areas affected by Defendant's illegal actions consist of the following counties in Western Washington: King, Snohomish, Island, Kitsap, Clallam, Jefferson, Mason, Pierce, Thurston, Lewis, Grays Harbor, Cowlitz, Pacific and Wahkiakum Counties.

## IV.     FACTUAL ALLEGATIONS

7.     The Union was the exclusive collective bargaining representative of certain classifications of Northshore employees for King, Snohomish, Island, Kitsap, Clallam, Jefferson, Mason, Pierce, Thurston, Lewis, Grays Harbor, Cowlitz, Pacific and Wahkiakum Counties in the State of Washington.

8.     Northshore and the Union were parties to an expired collective bargaining agreement dated June 1, 2009 through May 31, 2012.  The collective bargaining agreement contained a final and binding arbitration procedure for labor disputes.  This arbitration procedure was found in the Parties' Letter of Understanding, which is an addendum to the Standard Form Union Agreement (referred to as the "LOU").

9.     The expired collective bargaining agreement was the result of a settlement. That settlement was memorialized in a Settlement Agreement, executed on January 12, 2015 ("Settlement Agreement").  The Settlement Agreement ended a lengthy and disruptive labor dispute that had lasted approximately 2 ½ years.

10.     The Settlement Agreement was intended to resolve all present and past issues between Northshore, the Union, and the local Trust Funds associated with the Union.

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 3
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 ● Fax: (206) 622-9927

11.     The Settlement Agreement contained a dispute resolution clause.  Northshore and the Union agreed to mediate any disputes over the remaining, interpretative, or enforcement matters of the Settlement Agreement; if the dispute was not resolved in mediation, Northshore and the Union agreed to be bound by the arbitration procedure in the LOU.

12.     Section 3.5 of the Settlement Agreement provides:

> For a period of 180 days after the *Agreement's Effective Date*, a *Company* employee may demonstrate that he/she did not receive their total wage scale (wages, plus benefits) either as scheduled, or in an equivalent manner.  This includes a total combination of wages, pension contributions, health and welfare payments, reduction of NWDC withholding, vacation, or overpayment on a check.  The *Company* will promptly make up the difference to the employee.  The Company will not be responsible for any additional payment obligations to a *Plan*.  <u>The parties agree that a dispute over this provision is subject to the dispute resolution clause of this *Settlement Agreement*</u>.

13.     The dispute resolution clause in the Settlement Agreement bound the Parties of that Agreement to the compulsory final and binding arbitration mechanism found in said LOU.

14.     On July 9, 2015, the last business day before the 180 days expired, the Union, by and through its attorney, presented a list of names and sought monies owed, pursuant to § 3.5 of the Settlement Agreement.  The request only contained a list of names.

15.     On July 13, 2015, Northshore, by and through its attorney, sought information from the Union.  This request was provided so Northshore could properly determine if the employees listed were owed any money under the terms of the Settlement Agreement; and if so, how much.

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 4
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
**701 Fifth Avenue, Suite 4040**
**Seattle, WA  98104**
**Ph. (206) 447-0182 ● Fax: (206) 622-9927**

16.     On July 20, 2015, the Union, by and through its attorney, provided a spreadsheet.  The Union provided no supporting documentation.  Nor did the Union provide any explanation as to how the spreadsheet was created, nor why certain information was missing.

17.     On July 28, 2015, Northshore, by and through its attorney, again sought the information related to its determination as to whether any employees were owed money pursuant to § 3.5 of the Settlement Agreement; and if so, how much.

18.     On August 7, Northshore and the Union met for bargaining.  The Union had indicated that a strike was possible.  At the end of the August 7, 2015 bargaining session, the Union claimed that one of the unresolved issues was the payment of "fringe benefits" as required by § 3.5 of the Settlement Agreement.

19.     On information and belief, on August 10, 2015, the Union held a strike authorization vote as it related to Northshore.  On information and belief, one of the issues discussed by Tim Carter was that Northshore still owed "fringe benefits;" he later stated that the Union needed to make an example of Northshore.

20.     On August 17, 2015, Northshore, by and through its attorney, received a letter (dated August 13, 2015) from the Union's attorney.  The letter was a response to Northshore's prior August 7, 2015 bargaining proposal.  The Union referenced the "fringe benefits" allegedly owed, pursuant to §3.5 of the Settlement Agreement.

21.     On August 19, 2015, the Union was informed that Northshore would not be working on the Bellevue Square South Commons, Alley 111 and Meydenbauer Convention Center job sites.

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 ● Fax: (206) 622-9927

22.     On August 20, 2015, the Union engaged in a strike against Northshore Sheet Metal.

23.     On August 20, 2015 and several days thereafter, the Union engaged in a strike action at the Bellevue South Commons site, even though the Union knew that Northshore was not present.   The Union was informed that Northshore would not be working on the Bellevue South Commons job site.   Northshore is a subcontractor to GLY Construction on this job site.

24.     On August 20, 2015, the Union, by and through its agents, was informed that Northshore would not be working on the Chambers Creek Waste Water Treatment Plant job site for an indefinite period of time.   On that same day and for several days thereafter, the Union, by and through its agents, engaged in picketing on that job site, even though the Union knew that Northshore was not present.   Northshore is a subcontractor to Mortenson Construction on this job site.

25.     On information and belief, the Chambers Creek Waste Water Treatment Plant has used a dual gate system, and the Union, by and through its agents, has unlawfully engaged in picketing action of the neutral gate.

26.     On information and belief, the Union, by and through its agents, has engaged in unlawful picketing at the Meridian Health Center and other job sites when Northshore was not present.   Northshore is a subcontractor to Lease Crutcher Lewis on the Meridian Health Center job site.

27.     Upon information and belief, in February 2016, the Union, by and through its agents, including but not limited to Tim Carter, Union Business Manager, threatened, coerced and pressured Union Bank with an economic boycott aimed at Union Bank's

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 6
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 ● Fax: (206) 622-9927

customers.  An economic boycott of Union Bank's customer's would ensue, unless Union Bank ceased doing business with Northshore.

28.     Upon information and belief, prior to March 1, 2016, the Union, by and through its agents, reached an agreement with the Northwest Sheet Metal Organizational Trust ("Organizational Trust") whereby the Organizational Trust would create pressure upon Plaintiff as it related to market recovery payments (also referred to as equity fund payments).  Market recovery or equity fund refers to a program whereby the union trust, such as the Organizational Trust, provides union contractors with financial assistance to compete against non-union contractors, who bid on targeted projects.

29.     On March 1, 2016, the Organizational Trust suspended market recovery payments owed to Northshore.

30.     Upon information and belief, in or around April 2016, Northshore was awarded a project (Fire Station 22).  The City of Seattle was the owner of the project.  On or around April 20, 2016, Aaron Bailey, a Union business agent, contacted a City of Seattle official and threatened labor unrest on the project if Northshore were allowed to work on the project.  The Union's threat was to injure the City of Seattle by delaying or harming the project, unless Northshore was kicked off the job.

31.     Upon information and belief, in or around April 2016, the Union, by and through its agents, including but not limited to Tim Carter, Union Business Manager, conspired with a competitor of Northshore, McKinstry, whereby McKinstry would work on the Union's behalf to have the General Contractor, Skanska, kick Northshore off of the Tahoma School project in Maple Valley, WA, and be replaced by McKinstry or another Union signatory.

*PLAINTIFF'S SECOND AMENDED*
*COMPLAINT* - Page 7
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 ● Fax: (206) 622-9927

32.     Upon information and belief, in or around May 2016, the Union, by and through its agents, including but not limited to Tim Carter, Union Business Manager, conspired with a competitor of Northshore, PSF Mechanical, whereby PSF Mechanical would work on the Union's behalf to have the General Contractor, Sellen Construction, kicked off of the 1063 Capital Way Block project in Olympia, WA, and replaced by PSF Mechanical or another Union signatory.

33.     On October 26, 2016, the Union was decertified as the bargaining representative for the Northshore employees.  The employees voted 58-0 to decertify the Union as the bargaining unit representative.

34.     After the Union was decertified, the collective bargaining relationship with Northshore ceased immediately.

35.     Upon information and belief, October 27, 2016, Union officials, Tim Carter, Aaron Bailey, Mark Riker, Jeff Stowe, and other business agents, had a secret meeting.  The purpose of the meeting was to discuss how to covertly continue to pressure Northshore after the Union was decertified as the bargaining unit representative.  The Union sought to outline methods to put Northshore out of business.

36.     Upon information and belief, at the secret October 27, 2016 meeting, the Union, by and through its agents, established a plan of action to meet its objective: (a) the Union would continue its economic action against Northshore, (b) the Union would work with the Organizational Trust (and other trusts) and Northshore's competitors to divert Equity Fund payments to Northshore's competitors.  This secret meeting culminated in an organized corporate action aimed at continuing the Union's economic action against Northshore to put it out of business.

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 8
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 ● Fax: (206) 622-9927

37.     Upon information and belief, after October 27, 2017, the Union, by and through its agents, including but not limited to Tim Carter, reached an agreement, understanding, combination or conspiracy with Dwight Nelson at the Organizational Trust to provide increased Equity Fund payments to Northshore's competitors (McKinstry, PSF Mechanical, Architectural Sheet Metal, Kenco and MD Sheet Metal, Architectural Sheet Metal, Ballard Sheet Metal, etc.) that were bidding on the same projects as Northshore.  The objective of this agreement and/or conspiracy was to continue to place economic pressure on Northshore and put the company out of business.   The Union also sought to exclude Carpenters' signatory contractors from the market.

38.     Upon information and belief, after October 27, 2017, the Union, by and through its agents, including but not limited to Tim Carter, reached an agreement, understanding, combination or conspiracy with McKinstry, PSF Mechanical, Architectural Sheet Metal, Kenco Construction and MD Sheet Metal that were bidding on the same projects as Northshore.  The objective of this agreement, understanding, combination or conspiracy was to continue to place economic pressure on Northshore and put the company out of business.  A secondary objective was to exclude architectural metal siding contractors that were signatory to the Carpenters from the market.

39.     Upon information and belief, since October 27, 2017, the Organizational Trust has provided market recovery payments to Northshore's competitors.  An object of these equity fund payments was to further the conspiracy between Defendant, the Organizational Trust and Northshore's competitors, and put Northshore out of business and exclude Carpenters' contractors from performing architectural metal siding work.

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 9
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 ● Fax: (206) 622-9927

40.     Upon information and belief, in late November 2016, the Union became aware that Northshore were engaged in conversations with the Pacific Northwest Regional Council of Carpenters ("Carpenters") to become the § 8(f) bargaining unit representative to Northshore's Western Washington employees.   On January 1, 2017, Northshore and the Carpenters entered into an § 8(f) Collective Bargaining Agreement.   Northshore has paid area standard wages in accordance with its labor agreement.

41.     Upon information and belief, in November 2016, Northshore was awarded work on the Pier 66 Improvements Project ("Pier 66").   The Port of Seattle was the owner of the project, and Turner Construction was the general contractor.   The Pier 66 project contained a Project Labor Agreement ("PLA").   A PLA is a pre-hire labor agreement, whereby all contractors, subcontractors and unions agree to the wages, hours and working conditions on that specific project prior to performing work.   This agreement requires all construction contractors and subcontractors that perform work on the Pier 66 project to adhere to the terms of the PLA, and corresponding craft labor agreements (such as the Union's Standard Form Union Agreement).   The PLA is open to all companies, expressly including union-represented and non-union companies alike.

42.     Upon information and belief, in or around December 2016, Defendant, in combination with Monty Anderson, of the King County Building Trades Council, reached an agreement, understanding, combination or conspiracy with the Port of Seattle to have Northshore kicked off the Pier 66 Project.   This agreement violated 29 U.S.C. § 158(e) of the NLRA.   The King County Building Trades Council acted as the Union's agent in this arrangement.   The Union's objective of this agreement was twofold: (a) financially harm Northshore and further the Union's objective to put Northshore out of business, and

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 10
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 ● Fax: (206) 622-9927

(b) ensure that the Pier 66 architectural metal work was performed by a Local 66 Union signatory contractor, excluding the Carpenters' signatory contractors from performing this work.  As part of this plan, the Port of Seattle, as the owner of the project, forced Turner Construction to cease using Northshore on the Pier 66 project.  This action by the Port of Seattle was taken in furtherance of its agreement with the Union.

43.     The Union has engaged in a strike action and/or boycott against Northshore since August 20, 2015.  Upon information and belief, this strike action and/or boycott has continued after October 26, 2016.  The purpose of this strike action and/or boycott is to: (a) force owners, general contractors and other individuals or entities to cease doing business with Northshore, and to put Northshore out of business; (b) to force those entities to use Union signatory contractors rather than Carpenters' signatory contractors; and, (c) monopolize the construction sheet metal work in Western Washington to companies that are signatory to Local 66.

44.     Upon information and belief, the Union, by and through its agents, threatened the Port of Seattle with economic action regarding the Pier 66 project.

45.     On information and belief, the Union's objective in picketing or threatening to picket the job sites is to coerce, pressure or force neutral employers, such as the general contractors, clients, and other businesses to cease doing business with Northshore.

46.     From August 20, 2015 – October 27, 2016, the strikers had pickets at Northshore's facility, as well as construction sites where Northshore was contracted to perform work.  The purpose of the pickets was to force Mortenson Construction, GLY Construction, Lease Crutcher Lewis, and the other general contractors and customers, to

**DAVIS GRIMM PAYNE & MARRA**
**701 Fifth Avenue, Suite 4040**
**Seattle, WA  98104**
**Ph. (206) 447-0182 ● Fax: (206) 622-9927**

cease doing business with Northshore, and/or force Northshore to enter into an illegal agreement with the Union in violation of the NLRA, and/or for another illegal objective.

47.     Upon information and belief, in March 2017, the Union, by and through its agents, threatened general contractors, architects, and engineers with a strike action if those companies continued to do business with Northshore.  The threats included a threat to picket the construction sites and at other locations, even if Northshore was not present.  The threats further informed those entities that the long-standing labor dispute with Northshore had never come to an end.

48.     Upon information and belief, in May 2017, the Union, by and through its agents, threatened construction contractors, such as Lease Crutcher Lewis, with a strike action if those companies continued to do business with Northshore.  The Union also threatened owners of projects, such as the Seattle Opera, with economic action harming those businesses should they permit Northshore to work on a project.  The threats included a threat to picket the construction sites and other locations, even if Northshore was not present.

49.     Upon information and belief, the Union, by and through its agents, and general contractors have reached an agreement, understanding, conspiracy or combination thereof, to exclude Northshore from the market area with the objective of putting Northshore out of business.

50.     Upon information and belief, the Union, by and through its agents, has an agreement, conspiracy, or combination thereof, with general contractors and other businesses to exclude Carpenters' signatories that perform architectural metal siding work from the market.  The Union has promised that it will not interfere with the general

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 12
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 ● Fax: (206) 622-9927

contractors' projects, provided the general contractor ceases doing business with Northshore.

51.     In the construction industry, subcontractors, such as Northshore, are predominantly informed of private sector work through a request to bid process with the general contractor.   The general contractor invites the subcontractor to bid on a project through a secured internet interface.

52.     Upon information and belief, in furtherance of these agreements between the Union and the general contractors, since October 27, 2016, GLY, Sellen Construction, Lease Crutcher Lewis, Turner Construction and other general contractors have refused to provide Northshore with bid opportunities, excluding Northshore from the market.   These general contractors are non-labor entities.   These general contractors do not have a collective bargaining agreement with the Union.

53.     Upon information and belief, Defendant has agreements, understandings, combinations or conspiracies with GLY, Sellen Construction, Lease Crutcher Lewis, and Turner Construction to exclude Carpenters' signatories, including Plaintiff, from performing architectural metal siding work in Western Washington.   The general contractors and the Union have agreed to exclude Carpenters' signatories, including Northshore, from architectural metal siding work in the market area, from the following projects since October 27, 2016.   During this period of time, Northshore was a signatory to the Carpenters. Here is a list of projects where the Union and the general contractor have acted under agreement, understanding, combination or conspiracy to exclude Northshore from the architectural metal siding market place in Western Washington since October 27, 2016:

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 13
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 ● Fax: (206) 622-9927

a. Block 52 is a construction project in Seattle, WA. Lease Crutcher Lewis was the general contractor. Snyder Roofing, a subcontractor, was instructed by the general contractor to exclude Northshore from the project. Upon information and belief, Northshore was excluded from the project by the general contractor in agreement, understanding, combination or conspiracy with the Union to exclude Plaintiff from the market place.

b. Multicare Covington is a construction project in Covington, WA. Sellen Construction was the general contractor. Snyder Roofing, a subcontractor, was instructed by the general contractor to exclude Northshore from the project. Upon information and belief, Northshore was excluded from the project by the general contractor in agreement, understanding, combination, or conspiracy with the Union to exclude Plaintiff from the market place.

c. Block 20 is a construction project in Seattle, WA. Sellen Construction was the general contractor. Snyder Roofing, a subcontractor, was instructed by the general contractor to exclude Northshore from the project. Northshore was excluded from the project by the general contractor in agreement, understanding, combination, or conspiracy with the Union to exclude Plaintiff from the market place.

d. Pier 66 was a Port of Seattle project with a PLA. The PLA expressly stated that all union and non-union companies were eligible to

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 14
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA 98104
Ph. (206) 447-0182 • Fax: (206) 622-9927

perform the work.  Turner Construction informed Northshore that the Port of Seattle had directed Turner to exclude Northshore from the project.  Upon information and belief, the Union, in combination with the King County Building Trades Council, reached an agreement, understanding, combination, or conspiracy with the Port of Seattle and Turner Construction to exclude Carpenters' signatories that performed architectural metal siding work, including Plaintiff, from the market place.

54.     Northshore's bargaining unit employees proceeded to engage in a concentrated work stoppage and picketed Northshore, and its constructions sites.  This threat of a work stoppage has continued unabated.

55.     General Contractors, with whom Northshore has performed work, have demanded that Northshore not perform work on their job sites, even after the strike allegedly concluded on October 26, 2017.  Mortenson Construction, GLY Construction, Lease Crutcher Lewis, Turner Construction, Sellen Construction and the other general contractors, are neutral employers.  These entities are engaged in commerce or in an industry affecting commerce.  29 U.S.C. § 152(7).

56.     Upon information and belief from October 20, 2015 to the present (and have continued past October 26, 2016), the Union, by and through its agents, representatives, and/or members, has unlawfully engaged in, induced or encouraged neutral employers, including but not limited to contractors, customers and clients, through threats, demonstrations or picketing to force the neutral employers to cease doing business with

**DAVIS GRIMM PAYNE & MARRA**
**701 Fifth Avenue, Suite 4040**
**Seattle, WA  98104**
**Ph. (206) 447-0182 ● Fax: (206) 622-9927**

Northshore.  These contractors, customers, and clients are engaged in commerce or in an industry affecting commerce, pursuant to 29 U.S.C. § 152(7).

57.     On information and belief from October 20, 2015 to the present (and have continued past October 26, 2016), the Union, by and through its agents, has communicated threats to neutral employers that they may be the subject of a picket should they continue to do business with Northshore.

58.     The Union has unlawfully engaged in secondary activity against neutral employers by unlawfully threatening secondary pressure unless those neutral employers immediately cease doing business with Northshore in violation of Section 8(b)(4) of the NLRA.

59.     The Union has engaged in strike activity on job sites, whether Northshore employees are present and working, or not present and working.

## V.       CAUSES OF ACTION

## SECONDARY BOYCOTT VIOLATIONS, 29 U.S.C. § 187

60.     Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 59 above as if fully set forth herein.

61.     Under the NLRA, Congress protected certain conduct, prohibited certain conduct, and left other conduct to the free play of the parties' respective economic forces. In deciding what conduct was prohibited, Congress struck a balance between labor and management in their federal collective bargaining relationships.

62.     Section 8(b)(4)(ii)(B) of the NLRA, 29 U.S.C. 158(b)(4)(ii)(B), makes it an unfair labor practice for a labor organization or its agents to "threaten, coerce, or restrain" any person engaged in commerce or in an industry affecting commerce where an object

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 ● Fax: (206) 622-9927

thereof is "forcing or requiring any person to," among other things, "cease doing business with any other person." Section 303 of the LMRA, 29 U.S.C. § 187, permits civil actions seeking damages for violations of Section 8(b)(4) of the NLRA.

63.     The Union has engaged in a campaign to pressure neutral employers to cease doing business with Northshore and/or refuse to use Northshore's product or perform services for Northshore in violation of Section 8(b)(4) of the NLRA. The Union has threatened neutral employers, including, but not limited to, Mortenson Construction, GLY Construction, Lease Crutcher Lewis, and other persons, with picketing of their jobsites, and an object of this picketing threat has been to force or require those same neutral employers to cease handling or otherwise dealing in the products of, and to cease doing business with Northshore.

64.     The general contractors, clients, customers, and/or businesses that Northshore works with are neutral employers in the dispute between the Union and Northshore. These neutral employers are engaged in commerce or industry affecting commerce, pursuant to 29 U.S.C. § 152(7).

65.     Upon information and belief, the Union's leadership, as part of their corporate campaign, orchestrated, authorized, and instructed members to engage in, or threaten to engage in demonstrations and picketing described herein resulting in the misconduct directed at Northshore from October 20, 2015 to the present. The Union's threats, coercion and restraint of neutral employers, including but not limited to Mortensen Construction, GLY Construction, Lease Crutcher Lewis, was for an unlawful object under § 8(b)(4) of the NLRA, including but not limited to pressuring these neutral employers to cease doing business with Northshore.

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 17
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
**701 Fifth Avenue, Suite 4040**
**Seattle, WA  98104**
**Ph. (206) 447-0182 ● Fax: (206) 622-9927**

66.     The Union's threatening, coercive, and restraining behavior was for an unlawful purpose, constituting illegal secondary activity, violating § 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4), and consequently violating § 303 of the LMRA, 29 U.S.C. § 187.

67.     As a proximate and direct result of the Union's coercive and illegal secondary conduct, Northshore has sustained and continues to sustain damages in an amount to be determined.

## SHERMAN ACT ANTITRUST, 15 U.S.C. §§ 1, 2

68.     Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 67 above as if fully set forth herein.

69.     Beginning on October 27, 2016 and continuing to the present, Defendant has engaged in an unlawful contract, combination, and/or conspiracy that unreasonably restrains interstate and foreign trade and commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

70.     The unlawful contract, combination or conspiracy consists of several continuing agreements, understandings, concerts of action, and common plans and/or schemes between and among: (a) the Defendant, the Organizational Trust and Northshore competitors, such McKinstry, PSF Mechanical, Architectural Sheet Metal, Kenco and MD Sheet Metal, etc.; (b) the Defendant, King County Building Trades Council, the Port of Seattle; and, (c) the Defendant and general contractors, such as GLY Construction, Turner Construction, Sellen Construction, and Lease Crutcher Lewis.  The purpose and effect of these agreements is to restrain and prevent Northshore, and other Carpenters' signatory contractors from competing in the architectural metal siding construction industry in Western Washington.

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 18
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 ● Fax: (206) 622-9927

71.     The contracts, agreements, understandings, combinations and/or conspiracies described above with the Defendant are beyond the scope of the labor exemption because: (a) Defendant has acted in concert with non-labor entities; and/or (b) Defendant has engaged in unlawful activities and/or objectives.

72.     Beginning on October 27, 2016 and continuing to the present, Defendant has attempted to monopolize the architectural metal siding trade interstate and foreign trade and commerce by excluding Carpenters' signatories, including Plaintiff, from the market place in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

73.     Defendant has acted with specific intent to monopolize the architectural metal siding market in Western Washington.

74.     There was and is a real danger that Defendant will succeed in its attempt to monopolize the architectural metal siding construction market in Western Washington because the Defendant's signatory contractors control a large percentage of the market and have the ability and actually do exclude its competition through use of anticompetitive process, such as the Equity Fund and the bidding process.  Further, success in excluding competitors such as Northshore will allow Defendant's signatory contractors, and consequently the Defendant, an illegal monopoly over the architectural metal siding construction work in Western Washington.

75.     Plaintiff's conduct constitutes a violation of Sections 1 and 2 of the Sherman Act, in that it consisted of an attempt by Defendant, beyond the statutory labor exemption for activities of labor organizations, in concert and conspiracy with non-labor organizations, such as the Defendant's non-signatory general contractors, signatory contractors,

**DAVIS GRIMM PAYNE & MARRA**
**701 Fifth Avenue, Suite 4040**
**Seattle, WA  98104**
**Ph. (206) 447-0182 ● Fax: (206) 622-9927**

construction managers, Organizational Trust Fund, and acted out in furtherance of an unlawful activity or objective.

76.     Defendant's illegal actions unreasonably restrain trade and adversely affect interstate commerce in the architectural metal siding construction market by limiting and restricting the ability of Carpenters' signatory contractors, such as Northshore, to pursue their trade and business, by excluding them from the market.  Defendant's illegal actions further involved reaching agreements with entities that violated 29 U.S.C. § 158(e) of the NLRA whereby the Union's objective was to exclude contractors signatory to a Carpenters' agreement, such as Plaintiff.  Moreover, the agreements with general contractors and/or owners that exclude Northshore that are not part of a collective bargaining agreement and limited to a specific job site are also violative of 29 U.S.C. § 158(e).

77.     Defendant has not acted in its self-interest.  Rather, it has had an unlawful objective in excluding Northshore from the market place.  Defendant sought to punish Northshore and its employees for engaging in § 7 rights protected by the NLRA, by putting Northshore out of business.  Defendant has further sought to exclude all architectural metal siding contractors that were signatory to the Carpenters from the market place.  These objectives were not aimed at protecting wages, hours or working conditions.  Thus, these objectives are illegal.

78.     There is no legitimate business purpose to justify the aforesaid anti-competitive conduct in restraint of trade of Defendant.

79.     Plaintiff has been injured in its business and property as a result of Defendant's violation of §§ 1 and 2 of the Sherman Act in that it was: (i) unlawfully precluded from bidding on architectural metal siding projects; (ii) denied work on contracts

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 20
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 ● Fax: (206) 622-9927

that it would have been awarded absent the illegal conspiracy; (iii) prevented from completing projects that it was rightfully awarded; (iv) caused to suffer unnecessary and unproductive costs; and, (v) hampered in its ability to market its services and expand its presence in the architectural metal siding construction industry in Western Washington consistent with the explosive growth in the construction industry.

80.    Defendant's actions have caused an injury to competition in the market for architectural metal siding work in the Western Washington area, and Plaintiff's injuries are of the type that the antitrust laws were intended to prevent and flow from that which makes Defendant's acts unlawful.

## TORTIOUS INTERFERENCE WITH BUSINSS RELATIONS

81.    Plaintiff realleges and incorporates the allegations contained in paragraphs 1 through 80 above as if fully set forth herein.

82.    Defendant is aware of the contractual relationship and future business relationships between Plaintiff and its customers and its general contractors.

83.    Defendant has intentionally interfered with Defendant's business relations and future business expectancy, attempting to promote its unlawful objectives.

84.    Defendant's efforts were made in an attempt to put Plaintiff out-of-business.

85.    Defendant's actions were also made in an attempt to interfere with Plaintiff's contractual relations.

86.    Defendant's efforts have damaged Plaintiff monetarily, as well as damaging its good-will with customers and potential customers.

**DAVIS GRIMM PAYNE & MARRA**
**701 Fifth Avenue, Suite 4040**
**Seattle, WA  98104**
**Ph. (206) 447-0182 ● Fax: (206) 622-9927**

## VI.    DEMAND FOR JURY TRIAL

87.    Please take note that Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b) and Local Rule 38.

## VII.    INJUNCTIVE RELIEF

88.    Unless restrained, Defendant will continue to engage in its unlawful and injurious conduct as outlined above.  Without the imposition of injunctive relief, Plaintiff will not be able to obtain complete relief from Defendant's wrongful and illegal acts.

## VIII.    PRAYER FOR RELIEF

1.    An Order enjoining Defendant from continuing its illegal activities;

2.    Actual, compensatory and treble damages due based on the Union's illegal secondary actions in violation of 8(b)(4) of the NLRA, 29 U.S.C. 29 U.S.C. § 187, and its illegal restraint of trade, 15 U.S.C. § 15.

3.    Declaratory relief based upon the Defendant's illegal actions, 15 U.S.C. §§ 2201 and 2202.

4.    Monetary damages, extraordinary expenses, attorney fees, costs, pre- and post-judgment interest due based on the Union's illegal secondary actions and illegal restraint of trade, 15 U.S.C. § 15.

5.    For such other and further relief as the Court finds just and equitable.

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 22
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
**701 Fifth Avenue, Suite 4040**
**Seattle, WA 98104**
**Ph. (206) 447-0182 ● Fax: (206) 622-9927**

Respectfully Submitted this 9th day of August, 2017.


By:/s/ Christopher L. Hilgenfeld
    Christopher L. Hilgenfeld, WSBA #36037
    DAVIS GRIMM PAYNE & MARRA
    701 5th Avenue, Suite 4040
    Seattle, WA  98104-7097
    Ph. (206) 447-0182
    Fax: (206) 622-9927
    Email: chilgenfeld@davisgrimmpayne.com
    **Attorneys for Plaintiff**
    **Northshore Sheet Metal, Inc.**

*PLAINTIFF'S SECOND AMENDED COMPLAINT* - Page 23
CASE NO. 15-cv-01349 BJR

**DAVIS GRIMM PAYNE & MARRA**
701 Fifth Avenue, Suite 4040
Seattle, WA  98104
Ph. (206) 447-0182 • Fax: (206) 622-9927