Richard G. McCracken, *rmccracken@msh.law*                    Honorable Barbara J. Rothstein
Paul More, *pmore@msh.law*
**McCRACKEN, STEMERMAN & HOLSBERRY, LLP**
595 Market Street, Suite 800
San Francisco, CA 94105
Tel:     (415) 597-7200
Fax:    (415) 597-7201

Daniel Hutzenbiler, *dhutzenbiler@mbjlaw.com*
MCKANNA BISHOP JOFFE, LLP
1635 NW JOHNSON STEET
PORTLAND, OR 97209
503-226-6111

*Attorneys for Sheet Metal Workers International Association, Local 66*

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| NORTHSHORE SHEET METAL, INC., <br><br>     Plaintiff, <br><br>   v. <br><br> SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, LOCAL 66 <br><br>     Defendant. | Case No. 2:15-cv-01349-BJR <br><br> DEFENDANTS' SHEET METAL WORKERS INTERNATIONAL ASSOCIATION LOCAL 66'S REPLY IN SUPPORT OF MOTION TO DISMISS BRIEF <br><br> **NOTED ON CALENDAR: OCTOBER 13, 2017** |

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 1

I.  Northshore's Sherman Act Claims Do Not Meet *Iqbal/Twombly* Standards. .......................1

   A.  Allegations of a "horizontal boycott" with "Northshore competitors" and general contractors do not state a claim. ........................................................................1

     1.  Northshore does not state a claim based on a conspiracy between the Union and general contractors. ........................................................................ 2

     2.  Northshore does not plead sufficient facts to support a claim that the Union conspired with "Northshore competitors." ........................................................................ 4

   B.  The "horizontal boycott" with the Organizational Trust does not state a claim. ...............6

   C.  The SAC does not state a claim under Sherman Act § 2. ....................................7

II.  Northshore's Tortious Interference Cause of Action is Preempted. ......................................8

III.  Northshore Does Not Address the Substance of the Union's First Amendment Claim. .....10

CONCLUSION ................................................................................................................ 11

REPLY IN SUPPORT OF MOTION TO DISMISS         Case No. 2:15-cv-01349-BJR

Sheet Metal Workers Local 66 (the "Union") demonstrates in this reply brief that (1) the allegations in the Second Amended Complaint ("SAC") do not state a claim for a horizontal group boycott in violation of Sherman Act § 1, or monopolization or an attempt to monopolize under Sherman Act § 2; (2) that Northshore's state-law tortious interference claim is preempted by Labor-Management Relations Act § 303, 29 U.S.C. § 187 under established law; and (3) that Northshore has not engaged substantively with the Union's demonstration that NLRA § 8(b)(4)(ii)(B) is an unconstitutionally content-based restriction on speech.

## ARGUMENT

## I. Northshore's Sherman Act Claims Do Not Meet *Iqbal/Twombly* Standards.

Northshore's opposition brief demonstrates why the SAC does not plead an antitrust cause of action. Northshore equates "threats of economic harm" against general contractors, and those general contractors' "acquiescence" to those threats, as tantamount to an antitrust conspiracy, even though this would make a broad swath of union activity—much of it protected by the First Amendment— illegal. It does not provide even the most basic details about the Union's alleged agreements with "Northshore's competitors." And it alleges an unlawful horizontal "group boycott" based on a job-targeting fund even though the Ninth Circuit has rejected this theory.

### A. Allegations of a horizontal boycott with "Northshore competitors" and general contractors do not state a claim.

Northshore alleges that a first horizontal group boycott was formed at an unstated point after October 26, 2016, when the Union was decertified as the bargaining representative of Northshore workers. It claims this conspiracy involved a "plan . . . to combine with Local 66 signatory-employers (McKinstry, PSF Mechanical, Architectural Sheet Metal, Kenco, MD Sheet Metal, Ballard Sheet Metal) . . . and the Building Trades Council . . . to exclude Northshore (and other Carpenter-signatories) from performing architectural metal siding work[.]" Doc. 105, at 11.

Northshore's complaint describes only a handful of projects on which it claims the Union's "plan" was actualized. But it alleges no evidentiary facts to support the claim that the Union entered

1

into an agreement with any "Northshore competitor," and it improperly equates general contractors' "acquiescence" to the Union's threats of economic harm with a conspiracy to restrain trade.

### 1. Northshore does not adequately plead a Union/general contractor conspiracy.

A union has the right to take many different forms of economic action against general contractors who contract with companies with which the union has a labor dispute. For example, unions may distribute leaflets urging a boycott of the contractor's client. *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 588 (1988). They may "hold[] aloft large banners announcing a 'labor dispute'. . . . [that] are located so that they are visible to customers of businesses that deal with certain contractors who do not have union contracts." *Overstreet v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, 409 F.3d 1199, 1201 (9th Cir. 2005). They may erect large, inflatable rats at worksites where a contractor with which they have a labor dispute is performing work. *Laborers Local 330 v. Town of Grand Chute*, 834 F.3d 745, 751 (7th Cir. 2016) (Posner, J.,) ("There is no doubt that the large inflated rubber rats widely used by labor unions to dramatize their struggles with employers are forms of expression protected by the First Amendment."). They can dress as the Grim Reaper and engage in a mock funeral procession in front of a hospital that employs a non-union contractor. *Sheet Metal Workers Local 15 v. NLRB*, 491 F.3d 429, 436-40 (D.C. Cir. 2007). These forms of economic pressure on general contractors and their clients are not only lawful, but protected by the First Amendment. Other conduct that might be unlawful under federal labor law, such as secondary picketing, is statutorily excepted from antitrust liability. *Connell Constr. Co. v. Plumbers & Steamfitters*, 421 U.S. 616, 621-22 (1975).

The antitrust "conspiracies" with general contractors that Northshore claims are all based on allegations that those general contractors "acquiesced" to the Union's "threats of economic harm." Northshore alleges that the Union obtained general contractors' "'agreement' to exclude Northshore from architectural metal siding projects by threatening the Owners and the Generals with economic harm, unless they removed and stopped using Northshore . . . on projects." Doc. 105, at 12. Northshore alleges that "[t]he Port of Seattle "acquiesced" to the Union's threat of "economic harm"

leading the Port of Seattle to "remove Northshore from the Pier 66 project." *Ibid*. It claims that another general contractor, Lease Crutcher Lewis, "kicked Northshore off of the Block 52 project" after the Union "threatened [it] with economic harm." *Id*. at 13. It claims that the Union "reach[ed] a similar arrangement with the General Contractor, Snyder Roofing, on the Multicare Covington project, and that Snyder removed Northshore after the Union threatened that "it would face economic harm" if it did not. *Ibid*.[1] It claims that the Union "threatened owners of projects, such as the Seattle Opera, with economic action harming those businesses should they permit Northshore to work on a project." SAC, Doc. 98, at ¶ 48.

On the projects that Northshore names as having been the object of the Union's conspiracy, Northshore does not provide any information about what the "threat of harm" that led to the general contractors' acquiescence to the Union allegedly was. But allegations that the Union threatened general contractors and that they acquiesced "could just as easily suggest rational, legal business behavior"—the general contractor's decision that it does not want to have its job site marred by a labor dispute—"as they could suggest an illegal conspiracy" and are insufficient to plead a Sherman Act violation. *Kendall v. Vines U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008); *Twombly*, 550 U.S. at 554 (allegations that are "consisten[t] with conspiracy, but just as much in line with a large swath of rational and competitive business strategy" insufficient). Indeed, they could just as easily suggest a rational, legal reaction by general contractors to Union conduct and speech that is protected by the First Amendment. *Franchise Realty Interstate Corp. v. San Francisco Local Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1082 (9th Cir. 1976) (requiring particularity in pleading antitrust action against union that potentially encompassed First Amendment activity: "The Supreme Court has consistently recognized the sensitivity of First Amendment guarantees to the threat of harassing litigation, and has erected barriers to safeguard those guarantees.").

Northshore appears to argue that the alleged fact that more than one general contractor has

---

[1] Northshore is confused about the contents of its own complaint. In the SAC, Northshore alleges that Snyder was a subcontractor, not a general contractor, and that Snyder was instructed by a different general contractor to remove Northshore. SAC, Doc. 98, at ¶ 53(b). There is no allegation in the SAC of the Union threatening economic harm against Snyder Roofing.

REPLY IN SUPPORT OF MOTION TO DISMISS          Case No. 2:15-cv-01349-BJR

dropped Northshore from a project in the face of Union threats is evidence of a conspiracy, claiming that "the parallel conduct of one conspirator occurring around the same time may be sufficient evidence of a conspiracy under antitrust law."  Doc. 105, at 11; *see also* id. at 16 ("The parallel conduct of the Generals and Owners is largely consistent with an understanding that if they agree not to do business with Northshore they will not be harmed.").  But Northshore fails to quote the entire passage of the decision from which it draws this conclusion, which made clear that mere allegations of parallel conduct do not state a claim under *Twombly*:

> Under *Twombly,* parallel conduct, such as competitors adopting similar policies around the same time in response to similar market conditions, may constitute circumstantial evidence of anticompetitive behavior.  *But mere allegations of parallel conduct—even consciously parallel conduct—are insufficient to state a claim under § 1.*

*In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) (emphasis added).  The only "plus factor" that Northshore cites is the fact that general contractors had previously selected Northshore as a subcontractor before deciding to drop it after the Union made threats.  Doc. 105, at 16.  But this does not create any more of an inference that there was a conspiracy among general contractors and the Union to restrain trade.  The fact that general contractors had previously selected Northshore is equally consistent with the conclusion that general contractors—when confronted with the Union's alleged threats—each made the decision that they would prefer not to have their job site involved in a labor dispute.

> **2.  Northshore does not adequately plead a conspiracy with sufficient facts to support a claim that the Union conspired with "Northshore competitors."**

To meet *Iqbal/Twombly* pleading standards, Northshore was required to plead evidentiary facts—not just conclusory allegations—that could plausibly support the conclusion that an agreement to restrain trade exists between the Union and Northshore's competitors.  *Twombly*, 550 U.S. at 556.  It is insufficient to simply allege "[u]pon information and belief, [that] after October 27, 2017, the Union, by and through its agents, including but not limited to Tim Carter, reached an agreement, understanding, combination or conspiracy with McKinstry, PSF Mechanical, Architectural Sheet

Metal, Kenco Construction and MD Sheet Metal . . . to continue to place economic pressure on Northshore and put the company out of business." SAC, Doc. 98, at ¶ 38; *see also* SAC, Doc. 98, at ¶ 49 ("Upon information and belief, the Union, by and through its agents, and general contractors have reached an agreement, understanding, conspiracy or combination thereof, to exclude Northshore from the market area with the objective of putting Northshore out of business.").

Northshore only names a few projects on which it claims the Union's "conspiracy" was actualized, and it does not allege any evidentiary facts about these projects to support the claim that the Union entered into agreements with "Northshore competitors" to restrain trade on them. On the "Pier 66" project, Northshore does not name any "Northshore competitor" with which the Union allegedly conspired to have Northshore removed from the project. SAC, Doc. 98, at ¶¶ 41-42. Nor does Northshore name any "Northshore competitor" with which the Union is alleged to have conspired on the "Block 52," "Multicare Covington" or "Block 20" projects. SAC, Doc. 98, ¶ 53(a)-(c). On each of these projects, Northshore merely alleges that the Union threatened economic action and the general contractor "acquiesced" by removing Northshore from the job. Northshore's brief mentions a "Seattle Opera" project where the Union allegedly "combined with the Northshore competitors," Doc. 105, at 14, but the only allegation about the Seattle Opera is the following: "The Union also threatened owners of projects, such as the Seattle Opera, with economic action harming those businesses should they permit Northshore to work on a project." SAC, Doc. 98, at ¶ 48.

What is left are conclusory allegations of an agreement between the Union and "Northshore competitors" that lack any evidentiary facts about who entered into the agreements and when, or what the nature of the agreements were. *See* SAC, Doc. 98, at ¶¶ 38, 70. A plaintiff cannot make out an antitrust cause of action based on allegations of this nature:

> Even in a complaint, formulaic recitations and "conclusory statement[s]" will not suffice to allege conspiracy plausibly. A complaint must "answer the basic questions: who, did what, to whom (or with whom), where, and when?" Bare assertions of "agreement," or identifications of particular persons as "co-conspirators," will not suffice.

*United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO*, 770 F.3d 834,

REPLY IN SUPPORT OF MOTION TO DISMISS          Case No. 2:15-cv-01349-BJR

842 (9th Cir. 2014) (internal citations omitted); *Twombly*, 550 U.S. at 565 n.10 (finding allegations of conspiracy insufficient where "the pleadings mentioned no *specific* time, place, or person involved in the alleged conspiracies") (emphasis added).

### B. The "horizontal boycott" with the Organizational Trust does not state a claim.

Northshore also claims that the Union entered into a horizontal boycott with employers that are signatory with the Union through the job-targeting fund established pursuant to their collective bargaining agreements. Doc. 105, at 19-22. Northshore claims that job-targeting subsidies from this fund "permits the Union and the Northshore Competitors to artificially inflate the prices for public works projects, and then subsequently providing [*sic*] the Northshore Competitors with a reduction in their own costs that are not seen by the customers" and that "[t]his arrangement reduces overall competition by effectively eliminating bidders on public projects." *Id*. at 21. Northshore's brief contains many factual allegations that do not appear anywhere in its SAC, which is obviously improper. *See, e.g., id*. at 20 ("The Organizational Trust will generally provide the contractor with $10-$20 per hour depending on the job.").

But the central problem with this theory is that it has been squarely rejected by the Ninth Circuit. In *Phoenix Electrical Co. v. National Electrical Contractors Association*, 81 F.3d 858, 862 (9th Cir. 1996), the Court held that job-targeting programs meet the non-statutory labor exemption to antitrust laws. A job-targeting program "affects only the parties; it does not bar any union or nonunion subcontractors from competing with the signatory subcontractors for construction jobs." *Ibid*. Further, such a program "concerns a mandatory subject of collective bargaining because it relates to wages[.]" *Ibid*. A job-targeting program like the one here is "the product of bona fide arm's-length bargaining." *See ibid*.; *see also Local Union 257, Int'l Bhd. of Elec. Workers v. Sebastian Elec.*, 121 F.3d 1180, 1187 (8th Cir. 1997) (job targeting fund was not subject to antitrust liability under the non-statutory exception); *Am. Steel Erectors v. Ironworkers Local 7*, 815 F.3d 43, 64–65 (1st Cir. 2016) (job targeting fund was "'anchored in the collective-bargaining process, concern[ed] only the parties to the collective bargaining relationship, and relat[ed] to wages,

hours, conditions of employment, or other mandatory subjects of collective bargaining.'").

Northshore argues that *Phoenix Electrical* only applies to job-targeting programs with "legitimate" objectives. Doc. 105, at 26 n.14. But the plaintiffs in that case made the same argument that Northshore does: that the job-targeting program was being used as a "sword" to exclude non-union competitors from the market. The Court agreed that "the parties to this agreement undoubtedly wanted the union subcontractors to increase their work at the expense of nonunion subcontractors." *Phoenix Electrical Co.*, 81 F.3d at 863. But that "is a legitimate goal of the union and its workers." *Ibid.* Here as in *Phoenix Electrical*, "[a]subsidy program that targets some jobs for more competitive wage components of signatory union subcontractor bids, and does not bar nonunion bidders from bidding on the same jobs, is in harmony with the policies of both the labor and antitrust laws." *Ibid.*

The conclusion that the job-targeting program, on the facts pled, falls within the non-statutory does not change merely because Northshore is claiming that job-targeting fund subsidies were targeted to jobs on which Northshore (or allegedly, unnamed other Carpenter-signatory employers) were also bidding, rather than ones on which non-union employers were bidding. The Ninth Circuit recently made clear that for purposes of the non-statutory exemption, this distinction does not matter:

> [T]he only anticompetitive harm that ICTSI alleges is that ILWU would be able to capture anticompetitive wages by suppressing competition, leading to higher prices for consumers. The suppressed competition just happens to be another labor union instead of individual workers. In both cases competition amongst labor is being suppressed to benefit a specific union. ICTSI alleges agreements that, even if illegal and "carry[ing] [their] own remedies under the labor laws," are still "within the purpose and the coverage of the exemption from antitrust liability.

*Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 863 F.3d 1178, 1192 (9th Cir. 2017).

**C. The SAC does not state a claim under Sherman Act § 2.**

Northshore's Sherman Act § 2 claim fails because it is based on the same conclusory allegations of anticompetitive "agreement, understanding, conspiracy or combination thereof" as its claim under Sherman Act § 1. *See* Doc. 105, at 22 ("incorporat[ing] the facts of the Carpenter Exclusion Boycott and the Organizational Trust Boycott herein").

7

Northshore's § 2 claim also fails because its allegation of competitive harm to the relevant market is entirely conclusory. *Cf.* SAC, Doc. 98, ¶¶ 74; *see, e.g.*, *Paladin Assocs., Inc. v. Mont. Power Co.,* 328 F.3d 1145, 1158 (9th Cir. 2003) ("Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury."); *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 140 (2d Cir.1998) (affirming dismissal where "Plaintiff has failed to plead its own market share" or the "market share purportedly absorbed by" the defendant's alleged co-conspirator); *Glades Pharms., LLC v. Murphy,* No. 1:06–CV–0940, 2006 WL 3694625, at *3 (N.D. Ga. Dec.12, 2006) (dismissing complaint, noting that "[t]he complaint makes no mention of how many competitors are in the [relevant] market or why [defendant's] entrance into the market would 'reduce prices'").

## II. Northshore's Tortious Interference Cause of Action is Preempted.

Northshore calls the Union's § 303 preemption argument "vague," but it is not vague at all. *Cf.* Doc. 105, at 30. A tortious interference claim that overlaps with allegations of unlawful secondary action is preempted by LMRA § 303, 29 U.S.C. § 187. *San Antonio Community Hospital v. Southern California District Council of Carpenters,* 125 F.3d 1230 (9th Cir. 1997) ("[I]nterference with prospective economic advantage and contractual rights claims are preempted by section 303 of the LMRA."); *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 15 F.Supp.3d 1075, 1108 (D. Or. 2014) ("[T]he Port's tortious interference counterclaim against ILWU is preempted by Section 303 and is dismissed."), *aff'd,* 863 F.3d 1178 (9th Cir. 2017); *see Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton*, 377 U.S. 252, 257 (1964) ("*Morton*") ("[T]he provisions of [the LMRA] § 303 mark the limits beyond which a court, state or federal, may not go in awarding damages for a union's secondary activities. . . .")

Northshore claims that its tortious interference claim "is only intended to cover conduct that is not covered by its § 303 claim. Doc. 105, at 28. But that is not how Northshore pled its claim. Northshore's tortious interference claim, as pled, is based on the same conduct as its § 8(b)(4)(ii)(B) secondary-picketing claim. Paragraph 81 of the Complaint, which sets forth Northshore's tortious

interference claim, incorporates "Paragraphs 1-67" of the SAC—all of the factual allegations in the SAC—which include Northshore's allegations of unlawful secondary picketing. SAC, Doc. 98, ¶¶ 24-26, 81. Northshore's § 8(b)(4)(ii)(B) cause of action incorporates Paragraphs 1-59 of the SAC— all of the SAC's factual allegations. SAC, Doc. 98, ¶ 60.

If Northshore "intends" that its state tortious interference claim not be based on the same factual allegations as its § 303 claim, then it is required to plead in a way that makes clear what facts relate to its § 8(b)(4)(ii)(B) and what facts relate to its tortious interference. Having failed to do so, the tortious interference claim is preempted by LMRA § 303.

Northshore says that it is "unclear what preemptive doctrine Defendant claims." Doc. 105, at 28 n.15. But the Ninth Circuit, like every other court to have addressed the issue, has concluded that LMRA § 303 has its own preemptive effect because Congress intended for § 8(b)(4) to be the sole regulatory means of addressing secondary conduct. *See Morton*, 377 U.S. at 258–59.

Northshore cites to cases that it says stand for the principle that "state claims based on a union's unlawful picketing are not preempted." Doc. 105, at 29. But the two Supreme Court cases to which Northshore cites predate *Morton* and modern labor preemption doctrine, and both involved violence and exclusion by physical force. *UAW v. Russell*, 356 U.S. 634, 636 (1958) (upholding state court jurisdiction to entertain action by employee for harm resulting from strikers' violence); *United Construction Workers v. Laburnam Construction Corp.*, 347 U.S. 656, 658 (1954) (same); *Rainbow Tours, Inc. v. Hawaii Joint Council of Teamsters*, 704 F.2d 1443, 1448 (9th Cir. 1983) ("mass picketing" so numerous and close together as to be "akin to a seizure of the plant"); *see also Morton*, 377 U.S. at 257 (preemption principle it announced did not apply to violent conduct); *BE & K Constr. Co. v. United Bhd. of Carpenters & Joiners of Am.*, 90 F.3d 1318, 1327–30 (8th Cir. 1996) (§ 303 preemption applies absent violence). Northshore does not allege any violent conduct.

Finally, Northshore cites *Retail Property Trust v. Carpenters*, 768 F.3d 938, 955 (9th Cir. 2014). But that case addressed "whether § 303 preempts state actions in trespass and nuisance." *Ibid.* The Court ratified its earlier conclusion in *San Antonio Community Hospital* that tortious interference

9

claims based on conduct prohibited by § 8(b)(4)(ii)(B) are preempted. *Id*. at 957.

**III.    Northshore Does Not Address the Substance of the Union's First Amendment Claim.**

Northshore does not engage substantively with the reasons that *Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015) makes clear that § 8(b)(4)(ii)(B) is unconstitutionally content-based.  Northshore claims that *Reed* was "focused only on municipal sign regulations," Doc. 105, at 7 n.4, ignoring the wide variety of statutes that have been declared unconstitutionally content-based in its wake.  *See* Doc. 99, at 1-2.  *Reed* did, in fact, overrule the holding in *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)—as most lower courts had interpreted that holding—that  "[t]he principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *See Reed*, 135 S. Ct. at 2228; *Norton v. City of Springfield*, 806 F.3d 411, 413 (7th Cir. 2015) (Manion, J., concurring) ("Over time, courts interpreted this statement to mean that it did not matter if a law regulated speakers based on what they said, so long as the regulation of speech was not imposed because of government disagreement with the message. . . .  On this point, *Reed* overrules *Ward*."); *cf*. Doc. 105, at 7.  As the Union has explained, *Reed*'s holding in this regard means that the justification previously given for § 8(b)(4)(ii)(B)'s recognized content discrimination—"Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife," *Safeco*, 447 U.S. at 616 —may no longer serve as a justification for avoiding strict scrutiny.  Doc. 99, at 11-12.[2]

The Union recognizes that the Court may consider itself bound to prior Supreme Court precedent under *Agostini v. Felton*, 521 U.S. 203, 237 (1997).  If that is so, then the Union will have preserved its First Amendment challenge to § 8(b)(4)(ii)(B) in this lawsuit and may present it to higher courts should either party appeal a decision in this suit.

---

[2] A recent unpublished case from the Ninth Circuit does not change this analysis.  *NLRB v. Teamsters Union Local No. 70*, 668 F. App'x 283, 283 (9th Cir. 2016).  That disposition was "not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36–3."  The Court did not address any of the points made in the Union's opening brief.

10

## CONCLUSION

For the foregoing reasons, Northshore's SAC fails to state a claim on which relief may be granted.

Dated: October 13, 2017

Respectfully submitted,

**McCRACKEN, STEMERMAN &**

**HOLSBERRY, LLP**

/s/Paul More
Richard G. McCracken, *rmccracken@msh.law*
Paul More, *pmore@msh.law*
595 Market Street, Suite 800
San Francisco, CA 94105
Tel:    (415) 597-7200
Fax:    (415) 597-7201

**MCKANNA BISHOP JOFFE, LLP**

Daniel Hutzenbiler, *dhutzenbiler@mbjlaw.com*
MCKANNA BISHOP JOFFE, LLP
1635 NW JOHNSON STEET
PORTLAND, OR 97209
503-226-6111

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of October, 2017, I electronically filed the foregoing documents:

**DEFENDANTS' SHEET METAL WORKERS INTERNATIONAL ASSOCIATION LOCAL 66'S REPLY IN SUPPORT OF MOTION TO DISMISS BRIEF**

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following.

Christopher L. Hilgenfeld
Davis, Grimm, Payne & Marra
701 Fifth Ave., Ste. 4040
Seattle, WA 98104
202-447-0182
Fax: 206-622-9927
Email: chilgenfeld@davisgrimmpayne.com

*/s/Katherine Maddux*
Katherine Maddux
595 Market Street, Suite 800
San Francisco, CA 94105
Tel:    (415) 597-7200