THE HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NORTHSHORE SHEET METAL, INC., and JEFFREY D. MEYER, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, LOCAL 66, <br><br> Defendant. | NO. 15-CV-1349 BJR <br><br> ORDER ON MOTION TO DISMISS THIRD AMENDED COMPLAINT AND MOTION TO STRIKE |

## I. INTRODUCTION

This matter comes before the Court on the Motion to Dismiss Plaintiffs' Third Amended Complaint ("TAC") filed by Defendant Sheet Metal Workers International Association, Local 66 ("Local 66"). (Def's Mot. Dismiss, ECF No. 131). Local 66 seeks dismissal of the Second, Third, Fourth, and Fifth Claims for relief in the TAC. Local 66 also raises a constitutional challenge to the First Claim for Relief. The motion is opposed by Plaintiffs Northshore Sheet Metal, Inc. ("Northshore") and its President,

1

Jeffrey D. Meyer ("Meyer").[1] Northshore combined its response with a motion to strike both the Declaration of Paul More and certain pages of Local 66's motion over the Court's 15-page limit. (Resp., ECF No. 141). Having considered the pleadings filed in support and in opposition to the motions, the Court rules as follows.

## II. BACKGROUND

### A. Preliminary Motion to Strike

Northshore requests that the Court strike the Declaration of Paul More and related attachments as an improper reference to material outside of the pleadings. (Resp. 2-3, ECF No. 141). Northshore also requests that the Court strike page 16 of the motion and the incorporation by reference of certain pages of a prior motion to dismiss as in violation of the Court's page limit requirement. (*Id.* at 3).

The court's determination of the sufficiency of a complaint under Rule 12(b)(6) is ordinarily limited to the complaint itself without reference to any evidence outside of the pleadings. *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993). The court may not rely on materials outside of the pleadings or take judicial notice of disputed factual matters. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). Despite the general rule, a court may consider materials properly attached to the complaint or matters of judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Local 66 argues that the Court should consider the More Declaration and attached discovery requests because the authenticity of these documents is not in dispute. (Reply 3:17-19, ECF No. 143). This argument is unavailing. The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint, not to determine if the plaintiff has received enough discovery. Although the Court is not required to ignore the procedural posture of the case, whether Northshore has received some specific quantum of discovery is not relevant given the Court's legal conclusions as to the sufficiency of the claims in the TAC. It is not appropriate for the Court to consider the Declaration since it is not part of the TAC. The Court grants the motion to strike the More Declaration and the attached documents.

---

[1] The Court refers to Plaintiffs Northshore and Meyer collectively as "Northshore" in this decision.

Although the Court will not consider the More Declaration, it will consider the additional text over the 15-page limit imposed by the Court's Standing Order for Civil Cases. (ECF No. 81). Northshore's own response totals some 38 pages. To Northshore's credit, it did request leave to file an overlength brief based on the "extraordinary complexity" of the issues presented in this case. (Mtn. for Leave, ECF No. 138). Ideally, Local 66 should have made a similar request prior to filing the motion to dismiss. In order to reach the merits of the motion and to avoid any unfairness in striking the last page of Local 66's motion while allowing some 23-pages of Northshore's response, the Court denies the request to strike the additional pages.

B. Factual Background

Local 66 is a labor union representing workers located in Western Washington. (TAC 2:17-21, ECF No. 128). Northshore is an Architectural Sheet Metal ("ASM") contractor doing business in Western Washington with Plaintiff Meyer serving as its president. (*Id.* at 2:9-16). Northshore provides fabrication and assembly of ASM on major construction and building products throughout Western Washington.[2] (*Id.* 3:3-7). To obtain work, Northshore bids on contracts offered by general contractors in the region and is in competition with a number of companies that currently have Collective Bargaining Agreements ("CBAs") with Local 66. (*Id.* at 8-9).

From June 1, 2009 through May 31, 2012, Local 66 had a CBA with Northshore. After the CBA expired, the parties sought to resolve issues arising from the expired CBA through settlement negotiations. (*Id.* 9:6-10). Northshore and Local 66 reached a settlement agreement on January 12, 2015. (*Id.* 9:11-14). The settlement agreement contained a binding arbitration clause and was intended to resolve the issues among Northshore, Local 66, and a trust fund associated with the union that administered a market recovery program ("Equity Fund"), which Northshore's employees had participated in previously. (*Id.* 9:18-22).

---

[2] The TAC defines a "major construction and building project" as any job that is $250,000 or greater.

Following execution of the settlement agreement, Northshore and Local 66 became embroiled in a new dispute involving fringe benefits allegedly owed to Northshore's employees. (TAC 11:1-4, ECF No. 128). The TAC alleges that Local 66 and its members began picketing Northshore at various job sites where Northshore held contracts to perform work. Northshore alleges that the picketing was part of a campaign by Local 66 designed to force general contractors and owners of various projects to cease doing business with Northshore. (*Id.* 11:5-8). As the dispute grew, Northshore sought and obtained a temporary restraining order to prevent a strike of its workers called for by Local 66 related to the fringe benefits. (TRO, ECF No. 21). The restraining order did not cover other conduct, such as picketing.

On October 26, 2016, Northshore's employees voted to decertify Local 66 as their bargaining representative. Northshore subsequently entered into a CBA with the Pacific Northwest Regional Council of Carpenters ("Carpenters") and this new association currently represents Northshore's employees as well as those of other ASM companies in the region. (TAC 15:4-6, ECF No. 128).

As a result of the fringe benefit dispute and eventual decertification, Northshore alleges that Local 66 is attempting to drive it and other Carpenters' signatories from the ASM market through threats of picketing and economic boycotts conveyed to general contractors and owners of construction projects. (*Id.* 12:15-25). Northshore further avers that Local 66 conspired with certain Northshore competitors that were Local 66 signatories to share bid information on various jobs in order to prevent Northshore and other Carpenters' signatories from successfully obtaining ASM work. (*Id.* 17:9-15). In furtherance of this conspiracy, Northshore additionally alleges that Local 66 used its influence over a union Equity Fund to direct targeted job money designed to help Local 66 members compete against non-union labor in a manner designed to harm Northshore and in breach of the 2015 settlement agreement resolving issues between Northshore and the Equity Fund. (*Id.* 16:8-14). Based on the allegations, the TAC claims that Local 66's conduct violates § 303 of the Labor Management Relations Act ("LMRA")[3], §§ 1 and 2 of

---

[3] 29 U.S.C. § 187

4

the Sherman Antitrust Act[4], and that Local 66's actions constitute the torts of interference with a business relation and civil conspiracy under Washington State law.

### III. Legal Standard

Local 66 requests dismissal of Northshore's Second, Third, Fourth, and Fifth Claims for relief with prejudice on the basis that Northshore has failed to state a claim upon which the court can grant relief pursuant to Federal Rule of Civil Procedure 12(b)(6). Local 66 also raises a constitutional challenge to the First Claim but does not specifically argue for dismissal for failure to state a claim. For the following reasons, the Court grants in part and denies in part the motion to dismiss.

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). The complaint will survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955 (2007). A claim is facially plausible if the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009) (internal quotation omitted).

When deciding a motion to dismiss, the court must accept the factual allegations in the complaint as true and construe the pleadings in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). In the context of conspiracy claims under the Sherman Act, a complaint relying on parallel conduct must allege more than "conspiracy," as this is the ultimate legal conclusion, and must provide some additional factual assertions of an illegal agreement to plausibly

---

[4] 15 U.S.C. §§ 1 & 2

state a claim. *See Twombly*, 550 U.S. at 566. Though not subject to a heightened pleading standard, courts must remain cognizant of the significant legal expense accompanying an antitrust lawsuit. *Twombly*, 550 U.S. at 558.

**IV.     Discussion**

A. <u>Claims under § 1 of the Sherman Act for Group Boycott and Kickback Conspiracy.</u>

Claims Two and Three of the TAC focus on violations of § 1 of the Sherman Act. The Sherman Act prohibits "any contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. To state a claim under § 1, the complaint must allege sufficient facts to plausibly suggest "(1) an agreement or conspiracy among two or more persons or distinct business entities, (2) by which the persons intend to harm or restrain competition, and (3) which actually injures competition." *Les Schockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507 (9th Cir. 1989) (internal quotation omitted). Some agreements are subject to *per se* liability because they are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Nat'l Soc. Of Prf'l Eng'rs v. United States*, 435 U.S. 679, 692 98 S.Ct. 1355 (1978). In other circumstances, the court must evaluate a claim under the rule of reason, which requires a more searching analysis, with the court weighing "the anticompetitive effects and the procompetitive effects or business justification advanced for the challenged restraint to determine whether it is unreasonable." *Les Schockley Racing*, 884 F.2d at 507.

*1. <u>The Group Boycott Claim.</u>*

In large part, Local 66 focuses on perceived deficiencies in the claim based on its visualization of a "hub-and spoke" conspiracy because the TAC fails to allege coordinated efforts between parallel actors in order to form a "rim" to the conspiratorial wheel. *See In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015) (traditional hub-and-spoke conspiracy requires a hub, spokes, and a rim). Vertical agreements that restrain trade are evaluated under the rule of reason analysis while horizontal agreements are considered *per se* violations. *Id.* at 1192 n. 3. It is therefore favorable to a

plaintiff to allege a *per se* restraint to avoid the more searching analysis and economic impact requirements of the rule of reason standard. The Court finds that the TAC meets the standard for a *per se* violation of the Sherman Act.

In the TAC, each "spoke" represents an agreement between Local 66 and one of the project owners or general contractors to not hire Northshore or to remove Northshore from jobs it had already bid on. The spokes are also comprised of direct competitors of Northshore. According to Local 66, even if the TAC contains sufficient allegations of vertical agreements, it fails to allege the necessary horizontal agreements in order to state a claim. The Court is not convinced.

Local 66's hyper-technical reading of the necessary elements of a § 1 claim based on *Musical Instruments* is not supported by the case law or by the *Musical Instruments* case itself. The Ninth Circuit Court of Appeals in *Musical Instruments* affirmed dismissal where a complaint failed to plausibly state that parallel action between certain manufacturers was anything more than similar responses to the same market pressure. *Musical Instruments*, 798 F.3d at 1196. The Ninth Circuit did not reject the whole notion of an antitrust violation based on a need to show a complete hub-and-spoke arrangement. To the contrary, the Ninth Circuit cautioned that "homespun metaphors for complex economic activities go only so far. Section 1 prohibits agreements that unreasonably restrain trade, no matter the configuration they take or the labels we give them." *Id.* at 1192. Even if an agreement is purely a collection of vertical agreements, that may result in a violation of the Sherman Act. *Musical Instruments*, 798 F.3d at 1192 n. 3 (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 898-99, 127 S.Ct. 2705 (2007)). Where the complaint relies solely on circumstantial evidence, the plaintiff must provide enough additional information to exclude the possibility that the defendant acted independently of the other alleged co-conspirators through conduct that is merely permissible competitive conduct. To show conspiracy through circumstantial evidence, the complaint must allege "plus factors" such as "price parallelism, product uniformity, exchange of price information, and opportunity to meet to form anti-competitive

policies." *Wilcox v. First Interstate Bank of Oregon*, 815 F.2d 522, 525-26 (9th Cir. 1987). Bid rigging is a *per se* violation of the Sherman Act. *United States v. Rose*, 449 F.3d 627, 630 (5th Cir. 2006).

   *i. The TAC plausibly alleges a violation of the Sherman Act.*

The TAC alleges that both prior to, and following termination of Local 66 as the exclusive collective bargaining representative for Northshore's employees, Local 66 engaged in a series of concerted actions designed to eliminate Northshore from the competitive market. In support of the conspiracy claim, the TAC includes various allegations that certain representatives of Local 66 conveyed threats to the City of Seattle, the Seattle Building and Trades Council ("Seattle BTC"), and a number of general contractors that employ or could employ Northshore on large regional projects. The TAC alleges that the goal of these threats was to further Local 66's attempts to eliminate the Northshore from the market. Local 66 posits that the complaint fails to allege a cognizable claim because any parallel action by the various owners and general contractors is "the rational business conduct of seeking to avoid a labor dispute on their jobsites . . . ." (Mtn. to Dismiss 5:23-24, ECF no. 131). The Court disagrees that this is sufficient to avoid the plausible allegations of a conspiracy to exclude Northshore in the TAC.

Although the TAC fails to allege any specific horizontal agreement between the owners or general contractors to exclude Northshore from the market, it does include sufficient allegations for the Court to conclude that a group of direct competitors comprising at least 70% of the ASM market worked with Local 66 and certain general contractors to exclude Northshore and other Carpenters' signatories from ASM jobs. For instance, the TAC alleges that Northshore was removed from the Pier 66 project after Local 66 and Seattle BTC worked together to pressure the Port of Seattle and its general contractor, Turner, to remove Northshore from the project and replace it with a direct competitor associated with Local 66. (TAC 22:8-21, ECF No. 128). Removal of Northshore would not provide an economic benefit for the general contractor because the new ASM contractor would not offer a better price under the project labor agreement. (*Id.* 22:1-7). The TAC also alleges that certain general contractors have refused to even provide Northshore and other Carpenters' signatories with bid opportunities, despite using these entities

8

for work in the past. (TAC 24:4-9, ECF No. 128). Finally, the TAC includes numerous instances where Local 66 contacted general contractors (or used a Northshore competitor to make contact) demanding removal of Northshore from projects. Although the TAC does not indicate that the general contractors specifically understood that all of them were to exclude Northshore, it does plausibly allege that a considerable number of general contractors understood and agreed to not allow Northshore to compete.

Although most of the allegations focus on vertical agreements between Local 66 and individual general contractors to exclude Northshore from projects, the TAC also includes sufficient facts for the Court to determine that a horizontal agreement between Northshore's ASM competitors existed and that the owners and general contractors were used as part of the overall conspiracy. Even if the owners of general contractors participated unwillingly, or for different reasons than Local 66, that does not insulate the conduct from antitrust scrutiny and does not mean the plaintiff fails to state a claim if the complaint successfully alleges acquiescence in a scheme with the effect of restraining trade. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 205 (4th Cir. 2002). The TAC plausibly alleges, through identity of parties, project, and date, that Northshore competitiors McKinstry, Architectural Sheet Metal, PSF Mechanical, Kenco Construction, and MD Exteriors, had knowledge of and jointly participated in Local 66's efforts coordinate project bids. On at least one occasion, Northshore's competitors did in fact coordinate bids for a project (Interlake High School Classroom Addition). (TAC 17:20-22, ECF No. 128).

Taken together, the TAC states a claim under § 1 of the Sherman Act based on the attempted exclusion of Northshore from the relevant market. Contrary to Local 66's assertion, the TAC plausibly states a claim by identifying the who, what, where and when of the conspiracy. In addition to the factual allegations related to the general contractors and competitors, the TAC further alleges that two of Local 66's employees, Tim Carter and Aaron Bailey, are also trustees of the Organizational Trust that operates or has control over the Equity Fund and is alleged to have the ability to direct job targeting funds to certain projects. (*Id.* 16:11-13). The TAC also plausibly alleges that Local 66 had the opportunity to meet

at various times to form the anti-competitive behavior, such as the meeting on or about October 27, 2016, the day after Local 66 was decertified by Northshore's employees as their bargaining representative.

Given the plausible allegations of concerted action to exclude Northshore and other Carpenter signatories from the relevant market, it is incumbent on Local 66 to point to some plausible pro-competitive reason for the parallel actions. All the motion to dismiss points to is that the owners and general contractors may have acted rationally in attempting to avoid the labor disputes threated by the Local 66. This is not the sort of legitimate business concern that could undercut other circumstantial evidence of an antitrust violation. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705 (1959) ("Group boycotts, or concerted refusals by traders to deal with other traders . . . have not been saved by allegation that they were reasonable in the specific circumstances"). "[E]ven purportedly involuntary participation in a conspiracy to boycott can still be viewed as an illegal boycott, since coerced but knowing acquiescence in an illegal scheme is still generally viewed as actionable participation." William Holmes and Melissa Mangiaracina, Antitrust Law Handbook, Group Boycotts Generally § 2:16 (2017). Local 66's position is untenable, essentially claiming that where it is successful in pressuring a job owner or general contractor to exclude a competitor from the market no antitrust action may stand. If the Court were to adopt this approach it would undercut antitrust liability just by virtue of the effectiveness of the threat even if the threat has no legitimate labor purpose.

*ii. Local 66's alleged conduct is not exempt from antitrust liability.*

As a secondary argument, Local 66 contends that even if it did exert illegal pressure against the various owners and general contractors to exclude Northshore from the market, the threatened conduct is exempt from antitrust liability based on the Clayton and Norris-LaGuardia Acts. 15 U.S.C. § 17; 29 U.S.C. §§ 101 *et seq.* The Court does not agree.

In general, an organized labor union may engage in those actions that otherwise might violate antitrust law based on either a statutory or nonstatutory exemption. *Granddad Bread, Inc. v. Cont'l Baking Co.*, 612 F.2d 1105, 1109 (9th Cir. 1979). The statutory exemption is subject to an important

limitation—the organized labor union must not combine with nonlabor groups. *Phoenix Elec. Co. v. National Elec. Contractors Ass'n*, 81 F.3d 858, 860 (9th Cir. 1996). The TAC is replete with plausible allegations that Local 66 combined or attempted to combine with nonlabor entities in order to accomplish its alleged goal of eliminating Northshore from the relevant market. Therefore, the statutory exemption does not apply.

The more difficult question is whether Local 66's conduct is covered by the nonstatutory exemption from antitrust liability. The nonstatutory exemption applies to an agreement to restrain trade when: "(1) the restraint primarily affects the parties to the agreement and no one else, (2) the agreement concerns wages, hours, or conditions of employment that are mandatory subject of collective bargaining, and (3) the agreement is produced from bona fide, arm's length collective bargaining." *Phoenix Elec. Co.*, 81 F.3d at 861 (citing *Continental Maritime of San Francisco v. Pacific Coast Metal Trades Dist. Council,* 817 F.2d 1391 (9th Cir. 1987)). The purpose of this exemption is to facilitate the ultimate goal of "meaningful collective bargaining" without subjecting those actions to antitrust scrutiny and thereby allow judicial use of antitrust law to resolve labor disputes. *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1125 (9th Cir. 2011). The *Safeway* panel engaged in a thorough discussion of the history and evolution of the nonstatutory exemption, which makes clear that the further an alleged restraint ventures from operating primarily in the labor market to instead impact the business market, the less likely it is that the nonstatutory exemption should insulate the conduct. *Safeway*, 651 F.3d at 1129-1131.

In this case, Local 66's alleged conduct impacted more than just Local 66 and Northshore. The allegations include conduct of multiple direct competitors, owners, general contractors, and alleged harms against not just Northshore, but other Carpenters' signatories as well. Some of this conduct occurred long after Local 66 was decertified as the bargaining representative for Northshore. The end result is a plausible allegation that the Local 66 was not in the throes of a legitimate labor dispute, but instead was engaging in actions designed to go outside of the traditional confines of a labor dispute to fix the market against Northshore and the Carpenters' signatories. This is anything but the narrow two-party

11

labor dispute envisioned by the non-statutory exemption. The "agreement" at issue here was not part of a collective bargaining effort but is alleged to consist of the concerted effort of Local 66 to force or obtain the participation of project owners, general contractors, and other direct competitors to exclude Northshore from jobs and essentially eliminate competition from the ASM market. As alleged in the TAC, the agreement has nothing to do with collective bargaining, but instead involved a scheme of retribution, utilizing actions inherently antithetical to competitiveness, such as bid rigging.

Local 66 attempts to narrowly define its conduct as merely protected incidental secondary picketing of a few employers. First, the scope of the threats plausibly alleged by the TAC appear to violate the prohibition on secondary picketing. *See NLRB v. Retail Store Emp. Union, Local 1001*, 447 U.S. 607, 616, 100 S.Ct. 2372 (1980). Second, the primary thrust of the allegations is a concerted effort to manipulate the market to harm Northshore. The core allegations of the TAC involve a concerted effort between direct competitors and Local 66 to outright exclude Northshore from working in Western Washington, and, where unable to do so by direct threats, to rig bidding on projects in a manner that would prevent Northshore from obtaining work. The bid rigging was combined with threats of picketing and economic boycotts designed to remove Northshore from present jobs where it was the winning bid, and to embroil would be employers in Local 66's plan to exclude Northshore with threats made both to the potential direct employers and the ultimate customers.

Local 66's conduct is not subject to any exemption from antitrust scrutiny and therefore the TAC states a claim for violation of the Sherman Act § 1 based on the attempted exclusion of Northshore and other Carpenters' signatories from the market.

> 2. *<u>The TAC states a claim under § 1 of the Sherman Act for a "Kickback Conspiracy" related to use of the Equity Fund.</u>*

The second § 1 claim in the TAC is based on Local 66's effort, with the assistance of the Organizational Trust, to use the Equity Fund in furtherance of the conspiracy by focusing Equity Fund monies to Northshore's competitors.

In general, job targeting or other similar union subsidy programs are not subject to antitrust claims because such programs are designed to increase the competitiveness of the union in areas of stiff competition with non-union labor. *See Phoenix Elec. Co.*, 81 F.3d at 862-63. The fact that a job targeting program as a whole does not violate antitrust law does not mean that the program and its funds cannot, under certain circumstances, become the subject of antitrust liability. *See American Steel Erectors, Inc. v. Local Union No. 7, Intern. Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43, 69 n. 6 (1st Cir. 2016).

Job targeting or market recovery projects almost always involve a union and a non-labor group. Therefore, the statutory exemption to antitrust liability often does not apply, as is the case here. *See American Steel Erectors, Inc. v. Local Union No. 7, Intern. Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 78 (1st Cir. 2008) (describing function of job targeting or market recovery programs). The nonstatutory exemption may cover the job targeting program, at least as it relates to conduct between the union and the employer receiving the funds. *See Phoenix Elec. Co.*, 81 F.3d at 862. A more difficult question arises, though, when the allegations are not merely that of a union attempting to increase its members' competitiveness against non-union labor, but instead involve additional allegations of a wider conspiracy. *See American Steel Erectors*, 536 F.3d at 80-81. In these instances it is possible that the nonstatutory exemption will not apply. *Id.* at 80.

Local 66 points to *Phoenix Elec. Co.* as determinative of this matter. *Phoenix Elec. Co.* addressed whether a job targeting program could qualify for the nonstatutory exemption if it was designed to compete with non-union labor. *Phoenix Elec. Co.*, 81 F.3d at 863. The panel in *Phoenix Elec. Co.* concluded that the supra-competitive effect of union members voluntarily giving up a portion of their wages to compete with lower cost non-union labor did not take the agreement out of the protection from Sherman Act liability. *Id.* at 862. In this case, the TAC indicates a different harm. Specifically, that the job targeting funds held by the Equity Fund are being diverted in a manner that furthers the conspiracy to exclude Northshore from the market. The allegation here is that by using the fund as an alter-ego,

13

Local 66 has both wrongfully ceased payments owed to Northshore by the Equity Fund while simultaneously propping up the bids of direct competitors, primarily on those contracts where Northshore submits a bid.

Although Local 66 may generally have the ability to direct funds to its own union employers while remaining within the nonstatutory exemption, the protection offered is not unlimited. *See Phoenix Elec. Co.*, 81 F.3d at 862-63. If Northshore is the low bidder by virtue of some economic advantage, the fact that a direct competitor is able to match or undercut the bid is typically the sort of supracompetitive activity recognized as appropriate by the Ninth Circuit. Nevertheless, it is possible that a job targeting fund could be used in a manner that would violate the Sherman Act, and the TAC contains sufficient allegations of such a violation. As discussed *supra*, the TAC plausibly alleges a scheme to exclude Northshore from the relevant market and prevent it and other Carpenters' signatories from even submitting bids in some instances. To the extent that Local 66's employees used their authority over the Equity Fund to further the conspiracy, that conduct is not protected by the nonstatutory exemption.

Local 66 argues that Northshore's ASM competitors must share bid information with the Organization Trust in order to receive Equity Fund money. Assuming this is true, Local 66 offers no logical explanation for why those competitors would share that information with each other or allow the Organization Fund to do so unless a short term agreement was in place to expand market share since these entities all compete for jobs. The TAC plausibly alleges that the Equity Fund, at the direction of Local 66's employees, diverted targeted fund money in a manner not guided by a goal of lowering prices to compete, but instead with the aim of eliminating ordinary market competition. This is the kind of harm that the Sherman Act is designed to prevent, especially where Local 66 combines with direct competitors to stifle the natural competition represented by the process of competitors bidding on jobs. The Court will not dismiss Claim Three.

//

//

B. <u>Claim under § 2 of the Sherman Act for Conspiracy to Monopolize.</u>

The Fourth Claim alleges that Local 66, in combination with Local 66 signatory employers, acted in a conspiracy to monopolize the ASM market in Western Washington. The Sherman Act § 2 makes it illegal for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2. To state a claim under § 2 of the Sherman Act for conspiracy to monopolize, a complaint must allege sufficient plausible facts to show: "(1) the existence of a combination or conspiracy to monopolize; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003). A complaint may also state a claim for an attempt to monopolize with plausible allegations of (a) specific intent to control prices or destroy competition, (b) predatory or anticompetitive behavior directed at accomplishing the goal, (c) a dangerous probability of achieving monopoly power, and (d) causal antitrust injury. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995). The requisite "specific intent" may be inferred from "conduct forming the basis for a substantial claim of restraint of trade or conduct that is clearly threatening to competition or clearly exclusionary, but the focus must be on proof of unfair or predatory conduct." *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 798 F.Supp.2d 1201, 1205 (C.D. Cal. 2011) (internal citations omitted).

Critical to any § 2 claim is that a single economic entity exist that may control the market. *Terminalift LLC v. Int'l Longshore and Warehouse Union Local 29*, 11-CV-1999, 2013 WL 2154793, at *3 (S.D. Cal. May 17, 2013). "The very phrase 'shared monopoly' is paradoxical; when a small number of large sellers dominates a market, this typically is described as an oligopoly." *Id.* (quoting *Oxbow Carbon & Minerals LLC v. Union Pac. R. Co.*, 926 F.Supp.2d 36, 46 (D.D.C. 2013)).

The motion to dismiss does not dispute that Northshore has properly identified the relevant market as Western Washington, and fails to identify why the Court should not accept Northshore's claim that collectively Local 66 and Local 66 signatories control at least 70% of the market. The Court has already

determined as discussed *supra* that the TAC contains sufficient plausible allegations of a conspiracy. The remaining question is whether such conspiracy has the potential to actually create an injury to competition within the meaning of § 2.

One of the key issues for Northshore is that the "monopoly" here would actually be composed of multiple ASM companies, all of whom apparently compete against each other. The antitrust laws serve to protect competition generally, not any individual competitor. The TAC simply falls short of stating a plausible claim where the attempted "monopoly" would leave a group of ASM competitors competing against themselves for bids. This is not a monopoly within the meaning of § 2 of the Sherman Act. *International Longshore and Warehouse Union v. ICTSI Oregon, Inc.*, 15 F.Supp.3d 1075, 1096 (D. Or. 2014); *NorthBay Healthcare Group, Inc. v. Kaiser Foundation Health Plan, Inc.*, 17-cv-05005-LB, 2017 WL 6059299, at *5 (N.D. Cal. Dec. 7, 2017); *Oxbow Carbon &,* 926 F.Supp.2d at 46. Northshore cannot state a claim for conspiracy to monopolize by an entire group of competitors, thus the Court will dismiss Claim Four with prejudice.

### C. State Claims for Tortious Interference with Business Relations and Civil Conspiracy.

The final claim in the TAC, Claim Five, is based on an injury to both Northshore and Northshore's President, Jeffrey Meyer. According to the TAC, Local 66's actions have resulted in harm to Northshore and Meyer by damaging goodwill with customers through intentional interference with business relations and future business expectancy. Local 66 argues that the state law claims are preempted by § 303 of the LMRA because the claims overlap with those raised in Claim One of the TAC.

Section 303 of the LMRA prohibits union activities designed to force a neutral employer to stop doing business with an employer with whom the union has a dispute. *Ahearn v. Int'l Longshore & Warehouse Union, Locals 21 & 4*, 721 F.3d 1122, 1128 (9th Cir. 2013). Commonly referred to as "secondary boycott" activities, a union is specifically prohibited from threatening, coercing, or otherwise pressuring a neutral employer to cease doing business with an entity that the union is involved in a dispute

with. A union that engages in secondary boycott activities violates § 8(b)(4) of the NLRA, which is a violation of § 303 of the LMRA.

The broad statutory wording of the LMRA has convinced courts that § 303 of the LMRA completely preempts state law causes of action based on the same conduct. *See Point Ruston, LLC v. Pac. Nw. Re'l Council of Carpenters*, 658 F.Supp.2d 1266, 1277 (W.D. Wash. 2009); *JTS, Inc. v. City of Seattle*, C13-663RAJ, 2013 WL 5913229, at *3 (W.D. Wash. Nov. 4, 2013) (collecting cases). The Ninth Circuit, however, rejected a complete preemption approach for § 303 claims after undertaking an extensive analysis of the various preemption doctrines. *See Retail Property Trust v. United Brotherhood of Carpenters and Joiners of America*, 768 F.3d 938, 948-49 (9th Cir. 2014). The *Retail Property* court discussed at length the history of labor law and the numerous instances where courts, including the United States Supreme Court, have attempted to define its contours in relation to state causes of action. The ultimate conclusion by the panel in *Retail Property* is that § 303 does not evince congressional intent to occupy the field but where a state is not regulating activity trending toward public safety, such as trespass laws, it is likely that the state cause of action conflicts with federal labor law. *See Retail Property Trust*, 768 F.3d at 959 (collecting cases). Therefore, the court must determine whether Claim Five of the TAC conflicts with federal law because the relief would frustrate effective implementation of § 303. *Id.*

In this case, the TAC alleges a state law claim for tortious interference with business relations and civil conspiracy and specifically points out that Claim Five is not based on any allegation used to support the § 303 claim. However, the TAC focuses on the use of union pressure tactics against neutral employers, such as the threats of picketing and economic boycotts, to make the claim that Local 66 interfered with Northshore's business relations. This is also the focus of § 303 of the LMRA. Unlike in *Retail Property Trust*, the TAC does not focus on state laws of general applicability designed for public safety. Instead, the TAC focuses on economic harms stemming from union conduct in a heated dispute between Northshore and Local 66. Although Northshore may claim to use a different set of facts for Claim Five, that is not the standard. Instead, it is whether the same nucleus of conduct that gave rise to

17

the § 303 secondary boycott claim also forms the basis for the state claim and, if so, whether the state regulation conflicts with federal labor law or is it instead a public safety concern. In this case, the state causes of action conflict with § 303 of the LMRA and its remedies.

Washington State recognizes a cause of action for tortious interference with business expectancy where: (1) there is a valid contractual relationship or business expectancy, (2) the defendant has knowledge of the relationship, (3) there is an intentional interference inducing or causing a breach of termination of the relationship or expectancy, (4) defendant's interference is for an improper purpose or used improper means, and (5) there is resulting damage. *Leingang v. Pierce County Med. Bur., Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (Wash. 1997). Washington also recognizes a claim for civil conspiracy, which is defined as a "combination of two or more persons agreeing to commit a criminal or unlawful act, or to commit a lawful act by criminal or unlawful means, or as a combination of two or more persons by concerted action to accomplish an unlawful purpose, or some purpose not in itself unlawful by unlawful means." *Couie v. Local Union No. 1849 United Broth. of Carpenters and Joiners of America*, 51 Wash.2d 108, 116, 316 P.2d 473 (Wash. 1957). Unlike the LMRA, Washington State allows for injunctive relief and therefore state law conflicts with the federal scheme. *See JTS, Inc.*, 2013 WL 5913229, at *4 (citing *San Antonio Cmt. Hosp. v. S. Cal. Fist. Council of Carpenters*, 125 F.3d 1230, 1235 (9th Cir. 1997)).

Although the TAC is not particularly detailed in regard to how the various allegations meet the elements of the two state law claims, it is evident that the basis for relief is Local 66's attempts to have Northshore excluded or removed from various jobs through unlawful secondary boycott activity. These claims are covered by the broad definitions of prohibited conduct covered by § 303 of the LMRA and additionally fall subject to regulation under federal antitrust law. The fact that Meyer may have suffered emotional distress does not change the result. If the resulting damage were the standard for preemption it would totally eviscerate the preemption analysis applicable to these cases. The LMRA covers any "individual" harmed by the unlawful secondary boycott activity, which includes Meyer. To allow a state

18

cause of action here would place state law squarely between two bodies of federal law carefully designed to weigh competing rights in the same economic sphere. State regulation in this instance is simply incompatible with the requirements of federal law. Claim Five is preempted and the Court will dismiss it with prejudice.

### D. Constitutional challenge to § 303 of the LMRA.

Though Local 66 does not specifically request dismissal of the First Claim in the TAC, it does devote time in the motion to arguing that § 303 of the LMRA is an unconstitutional restraint on First Amendment rights because § (8)(b)(4)(ii)(B) of the NLRA—the basis for the § 303 violation—is a restriction on speech. Citing *Reed v. Town of Gilbert*, --U.S.--, 135 S.Ct. 2218 (2015), Local 66 argues that § (8)(b)(4)(ii)(B) is a facially content, viewpoint, and speaker based restriction on speech. Essentially, Local 66 argues that the Supreme Court in *Reed* implicitly overruled its prior precedent upholding the constitutionality of § 8 of the NLRA despite never mentioning the cases on point. *See IBEW, Local 501 v. NLRB*, 341 U.S. 694, 705 (1951); *NLRB v. Retail Store Employees Union, Local 1001*, 447 U.S. 607, 614 (1980). The Court declines to hold that § 8(b)(4) of the NLRA constitutes an unconstitutional restriction on Local 66's free speech in light of controlling precedent.

The Supreme Court has clarified that where it has issued a prior decision that directly controls the outcome of a case, but whose viability appears in doubt based on subsequent decisions, "'the [lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'" *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 485 (1989)). Given that the Supreme Court has not overruled the prior decisional authority that controls this case, this Court does not find the statute unconstitutional.[5]

---

[5] The Court also questions the viability of arguing for an expansive reading of *Reed v. Town of Gilbert*. *See NLRB v. International Association of Bridge, Structural, Ornamental and Reinforcing Ironworkers Union, Local 433*, 891 F.3d 1182 (9th Cir. 2018).

19

## V. CONCLUSION

For the foregoing reasons, the Court hereby ORDERS as follows:

1. Northshore's motion to strike [141] is **GRANTED IN PART** and the Court will strike the Declaration of Paul More and related attachments, the remainder of the motion is **DENIED**;

2. Local 66's motion to dismiss [131] is **GRANTED** as to the claims based on conspiracy to monopolize under § 2 of the Sherman Act (Claim Four) and for tortious interference and civil conspiracy under Washington State law (Claim Five);

3. Claims Four and Five are **DISMISSED WITH PREJUDICE**.

4. Local 66's motion to dismiss is **DENIED** as to the claims under § 1 of the Sherman Act based on a contractor exclusion boycott (Claim Two) and kickback conspiracy (Claim Three).

**IT IS SO ORDERED**.

Signed this 24th day of September, 2018.

*Barbara J. Rothstein*

Barbara Jacobs Rothstein
U.S. District Court Judge